181 So. 439

**LOUISIANA CANAL CO., Inc., v. HEYD
et al.**

No. 34579.

April 4, 1938.

Rehearing Denied May 2, 1938.

Pujo, Hardin & Porter, of Lake Charles, for appellant.

Plauche & Stockwell, of Lake Charles, for appellee Ferdinand Heyd.

Geo. C. Schoenberger, Jr., of Houston, Tex., and Oliver L. Stone, of Baton Rouge, for appellee Shell Petroleum Corporation.

ODOM, Justice.

The facts disclosed by the petition in this case are that, on November 22, 1928, the defendant Heyd sold to plaintiff a strip of land 66 feet wide and one-half mile long "in a north and south direction, the center line of which is the half section line running north and south through the North half (N½) of Section Thirteen (13), Township nine (9) South, Range seven (7) West, containing four (4) acres."

Plaintiff did not record its deed until September 12, 1929. Subsequent to the date of the deed and prior to its recordation, Heyd granted to Frank W. Bennett an oil lease covering the entire half section of land, including the strip he had sold to plaintiff. The lease was recorded in the notarial records on June 19, 1929. On June 22 Bennett sold the lease to the Shell Petroleum Corporation. The lease was for one year and provided that in the absence of drilling operations it might be kept alive for an additional period by the payment of delay rentals of $800 each six months. The lease was kept alive by the payment of delay rentals until May, 1932, when Shell began drilling operations under the lease and brought in oil. It has since drilled some seven or eight wells, all producers. No well was drilled on the strip sold by Heyd to plaintiff, but some of them were drilled within a short distance from it.

In making the lease, Heyd ignored plaintiff entirely. Plaintiff was not consulted, but its land was covered by the lease. The deed to plaintiff not having been recorded at the time the lease was made, it seems that the lessee knew nothing of the sale. However, it is alleged that, when plaintiff learned that the lease had been made and recorded, it then recorded its deed and served notice on Shell that it had purchased the strip of land from Heyd, the notice being given in accordance with the following stipulation in the lease:

"No sale or assignment by lessor shall be binding on lessee for any purpose until lessee shall be furnished with an instrument in writing evidencing the sale or assignment."

Plaintiff alleged that a certified copy of the deed of purchase by plaintiff from Heyd had been furnished to Shell Petroleum Corporation, and paragraph 10 of the petition sets out that no drilling operations were begun within one year and that Shell paid the delay rentals and that

" * * * petitioner was paid by the Shell Petroleum Corporation on June 16, 1930, the sum of Ten ($10.00) Dollars, as petitioner's share of the 'rental' under the terms of the said oil and mineral lease, and that similar payments or rentals, and of the same amounts, were made to petitioner December 20, 1930, June 15, 1931 and December 8, 1931, in order to secure similar extensions of said lease."

It is alleged that the Shell Petroleum Corporation has produced large quantities of oil from the land covered by the lease and

"That one-eightieth ($\frac{1}{80}$) of one-eighth ($\frac{1}{8}$) of the proceeds of all of the oil produced on the said lands and which oil belonged to petitioner, has been paid by the Shell Petroleum Corporation to Ferdinand Heyd, and that by reason of all of the above, petitioner is entitled to recover from Ferdinand Heyd the payments so made to him."

Paragraph 23 of the petition reads as follows:

"That Ferdinand Heyd and the Shell Petroleum Corporation should be ordered to account for all of the oil produced on the above described lands, and the proceeds of the sale of such oil, in order that petitioner's rights therein may be determined."

It is alleged that the Shell Corporation paid to Heyd the proceeds of royalties due plaintiff after it had knowledge of all the facts, which was a violation of the terms of the lease, and for that reason the lease should be cancelled.

Plaintiff prayed for judgment ordering Heyd and the Shell Corporation to make an accounting showing the amount of oil extracted from the land and "condemning them jointly, to pay unto petitioner a one-eightieth ($\frac{1}{80}$) part of all sums paid as royalty coming from oil produced from the said above described lands," and that the lease be cancelled.

Defendants excepted to the petition on the ground that it set out no cause of action. The exception was sustained, and the suit was dismissed.

. Plaintiff appealed.

According to plaintiff's petition, it owns in fee 4 acres of land in the N. ½ of

section 13, T. 9 S., R. 7 W., or one-eightieth of the total acreage of that half section. This is not an undivided fractional interest, but the entire interest in a fractional portion of the tract. Heyd, without plaintiff's consent or knowledge, granted an oil lease covering the N. ½ of section 13, including plaintiff's 4-acre tract. At the time the lease was executed, plaintiff had not recorded the deed which Heyd had executed in its favor. Whether, as argued by counsel for plaintiff, Heyd committed a legal fraud by leasing plaintiff's land is not material to the issue involved, because it is conceded by both sides, and the trial judge so held, that by accepting its pro rata share of the delay rentals the plaintiff accepted and ratified the lease and made it its own.

Plaintiff is as firmly bound as if it had joined Heyd in making the lease. The effect of the ratification was to make the contract a lease by Heyd and plaintiff, covering both tracts of land, the small 4-acre tract owned by plaintiff and the larger tract owned by Heyd. This being one lease covering both tracts, the question is whether plaintiff has any royalty interest in the oil extracted from Heyd's tract of land, no well having been drilled on plaintiff's tract. That depends upon whether the contract became a joint lease by plaintiff's acceptance of it.

While plaintiff did not originally join Heyd in making the lease, the effect of accepting its share of the delay rentals after it had knowledge of all the facts was to make the contract its own. Heyd knew, of course, that a portion of these rentals was being paid to plaintiff. He made no objection. Therefore, these parties, as between themselves, are in precisely the same situation in so far as their mutual rights and benefits under the lease are concerned as if they had signed the lease together. After plaintiff had accepted the contract, it was no longer Heyd's lease but the lease of both, covering two adjacent tracts of land, made to one individual who assumed the obligation of delivering to the lessors as royalties, in case there was production, one-eighth of the oil produced. This was the consideration of the lease, aside from the delay rentals which were paid in order to keep the lease alive until operations were begun. The consideration which the lessee received was the privilege, granted by the lessors, of going upon and exploring the land covered by the lease for the production of minerals.

It is conceded by counsel for Heyd that, in as much as plaintiff owned one of the tracts covered by the lease, it was entitled to that proportion of the delay rentals which its tract bears to the total acreage. But counsel argue that, since there was no community, pooling or proportionate sharing clause in the lease, neither party is entitled to any royalty interest in oil produced from the land of the other.

It is argued by counsel for defendants that the issue here involved was settled by the cases of United Gas Public Service Co. v. Eaton, 153 So. 702, and of Herring v. United Gas Public Service Co., 153 So. 710 (both decided the same day by the Court of Appeal, Second Circuit), the Eaton Case having been approved by this court by its refusal to grant writs.

The Eaton Case is similar to this one in that Eaton and Emmons owned adjacent 40-

acre tracts of land and executed together one lease covering both tracts. Young, who owned one-half of the minerals in both tracts, joined them in making the lease. A producing gas well was drilled on the tract owned by Eaton, but no well was drilled on the Emmons tract. It was held that Emmons had no interest in the royalty or mineral rights on Eaton's tract.

It is argued that the Eaton Case is on all fours with this one, and that, since Emmons had no royalty interest in the gas produced from Eaton's land, it follows that plaintiff in the case at bar has no royalty interest in the oil produced from Heyd's land.

We approved the holding in the Eaton Case, but our reasons for doing so are explained at length in the case of Shell Petroleum Corporation v. Calcasieu Real Estate & Oil Co., 185 La. 751, 170 So. 785. In the course of our opinion, we said (page 790):

"The ruling was that Emmons and his transferees had no interest whatever in the royalty, or mineral rights on Eaton's 40 acres, because Emmons and his transferees had construed their contract to mean exactly that. Emmons and Eaton each sold off parts of their mineral rights, or interest in the royalty, after they and Young had entered into the lease; and, in each instance, Emmons sold the mineral rights, or interest in the royalty, only on his 40 acres; and in each instance where Eaton sold a part of his royalty or mineral rights he described only his 40 acres of land."

Further on in our opinion, still discussing the ruling of the Court of Appeal, we said (page 790):

"The ruling in that case, however, was founded upon the fact that, whenever either of the landowners, Emmons or Eaton, after making the lease, sold a fractional part of his royalty or mineral rights, he described only the 40-acre tract owned by him, and not the whole 80-acre tract that was leased."

In the Eaton Case, the Court of Appeal said (page 708):

"In the case at bar, had the lessors intended to pool their mineral interests by signing a joint lease to Perkins, it seems to us that Eaton and Emmons thereafter, when disposing of fractional portions of their royalty rights, would not have confined their transfers to the respective 40 owned by them, but would have described the entire 80-acre tract."

In the Herring Case, the ruling in the Eaton Case was followed. But those cases —one of them approved by this court—do not settle the question involved in the case at bar, because in the Eaton Case, while the parties had executed a joint lease, yet by their subsequent dealings they interpreted the lease contract to mean that neither had any interest in royalties derived under the contract from the land of the other.

In all cases where parties owning separate tracts of land execute together one oil and gas lease covering their separate tracts and where the lease contract contains no community or pooling clause, whether they are entitled to share proportionately in the royalties, regardless of which tract is developed, depends on the intention of the parties. From the fact that the parties join in the same lease contract and from that

fact alone, there does not necessarily arise a presumption that they intended to pool. In the case of Lusk v. Green, 114 Okl. 113, 245 P. 636, it was held:

"Where a husband and wife, each owning a tract of land not contiguous but several miles apart, execute an oil and gas mining lease, and each tract is separately described in and covered by the same lease contract, it will not be presumed that either intended to convey to the other a royalty interest in his or her land, unless there is some affirmative evidence evincing such intention."

■ No hard and fast rule of interpretation can be laid down for determining the intention of the parties in a given case, and no presumption of law arises one way or the other as to their intention from the mere fact that they sign a lease contract together. Where such lease contracts are silent as to the intention of the parties and where the parties have not by their conduct and dealings since the confection of the lease indicated their own interpretation of it, the circumstances under which the contract was made may and should be considered in order to determine their intention.

As the case was not tried on its merits but was dismissed on exception of no cause of action, we are not aided by knowledge of acts done by the parties under this lease, before the discovery of oil, which would indicate the construction which they put upon it. Nor have we before us the lease contract in full. But we understand from the arguments, both oral and in briefs, that it is an ordinary oil and gas lease, by the terms of which the lessor (Heyd alone signed it) granted to the lessee the right to explore

the tract for minerals, with the obligation on the part of the lessee, in case of production, to deliver to the lessor as royalty one-eighth of the oil produced or its proceeds. When Bennett acquired the lease and when he assigned it to Shell, neither knew that Heyd had sold a part of the tract to plaintiff, because plaintiff had not then recorded its deed. But Shell was notified of the sale and paid to plaintiff its pro rata share of the delay rentals, thereby recognizing plaintiff as the owner of the 4-acre tract. Heyd knew all this and made no protest, thereby acquiescing in the conduct of plaintiff which made it a party to the lease. What then is a reasonable conclusion as to what the parties intended to be the result, inter sese, of this contract?

■ It would be unreasonable to assume that plaintiff, under the circumstances, would have accepted, and made itself a party to, this contract if it had thought that it would not be permitted to share ratably, in proportion to its acreage, in the royalties from oil produced from any part of the tract covered by the lease. The lease covered the entire half section of land then owned, according to the records, by Heyd. The entire tract was to be developed as a unit, and plaintiff accepted the contract as written. As plaintiff owned only 4 acres, or one-eightieth of the entire tract, it is not probable that it would have consented to be bound by a contract under which the lessee could hold under lease for an indefinite period its small tract by drilling producing wells on the larger tract. It is settled that, where two adjacent tracts of land, owned by different parties, are covered by one lease,

development of either tract keeps the lease alive as to the other. Nabors v. Producers' Oil Co., 140 La. 985, 74 So. 527, L.R.A. 1917D, 1115.

■ If the result of its acceptance of the contract is that it can never reap any of the benefit of development unless and until the lessee sees fit to drill on its strip of land, which is only one acre wide and a half-mile long, then the chances are eighty to one that it will never reap any benefit at all from the lease. The pecuniary loss, to say nothing of the injustice, which might result from such a situation should patently appear to any one. Surely plaintiff did not intend thus to put itself into such a hopeless, impossible situation. We might as well assume that the master of a ship would intentionally sail into the Sargasso Sea. The reasonable assumption is that, by accepting the contract, plaintiff intended it to be a joint contract between itself and Heyd. Heyd cannot be heard to urge a different view. In fact, we do not understand from his counsel that he does. On page 5 of their brief they say:

"But, by accepting the rentals, plaintiff adopted and ratified the lease. One cannot claim the advantages growing out of a transaction without also being charged with the obligations and duties flowing from those same actions. In his reasons for judgment, Judge Pickrel [the trial judge] aptly stated it when he said, 'The fact that plaintiff accepted the rentals as paid by defendant Shell Petroleum Corporation and as is alleged in their petition, merely shows their acquiescence in the lease, and their acceptance of its terms and conditions'."

Therefore, according to counsel's own theory, this became a joint contract between plaintiff and Heyd, according to article 2080 of the Revised Civil Code, which reads as follows:

"When several persons join in the same contract to do the same thing, it produces a joint obligation on the part of the obligors."

By the contract, plaintiff and Heyd joined in the same contract to do the same thing—i. e., to permit the lessee to explore their lands and to reduce to possession and ownership such minerals as might be found. They did not enter into distinct obligations to perform different things in favor of several persons, R.C.C. art. 2079, but joined in the same contract to do the same thing, R. C.C. art. 2080.

Article 2081 of the Code reads as follows:

"When one or more persons make an obligation to several persons for the performance of something for the common benefit of all the obligees, it creates an obligation which is joint in favor of the obligees."

The lessee's obligation was joint in favor of plaintiff and Heyd. In consideration of the right granted to it by plaintiff and Heyd to explore their tracts for minerals, lessee obligated itself to deliver to them, not to one of them only, as royalty or rent one-eighth of the oil produced or its proceeds.

Instead of the case at bar falling squarely within the ruling in the Eaton and Herring Cases, as argued by counsel, a more recent case, one decided by this court, is controlling. We refer to Shell Petroleum Corporation v. Calcasieu Real Estate & Oil Co.,

185 La. 751, 170 So. 785, which was not mentioned in brief by either side.

The facts in that case were that a husband and wife signed together a mineral lease covering two tracts of land of equal area but not adjacent, one of which was owned and administered separately by the wife, the other owned by the matrimonial community. The tract which belonged to the community was mortgaged and at foreclosure sale was purchased by the defendant, and oil was produced from that tract alone. Mrs. Johnston, the wife, claimed one-half the royalties, not because of her half interest in the community estate, but because the lease contract covered two tracts of land of equal area, one of which she owned individually. Her contention was that the lease was a joint contract between her and her husband, under which the value of the royalty of one-eighth of the oil produced from either tract of land should be paid the lessors jointly—one-half to her and one-half to the defendants, who held title from the matrimonial community. It was argued in that case that, in as much as none of the oil was produced from Mrs. Johnston's land, she had no interest in the royalties. Although the contract did not in terms declare that it was intended to be a joint lease, the trial judge held, and we approved his holding, that it was intended to be, and was in fact, a joint lease. We said (page 788):

"The analysis which we have made of the contract in question shows that it is a joint lease, in the sense that the obligations of the lessors are joint obligations, and that the obligations of the lessee are in favor of the lessors jointly. It was so held, with reference to a similar contract of lease, in the case of Nabors v. Producers' Oil Co., 140 La. 985, 74 So. 527, L.R.A.1917D, 1115."

We quote at length the following from our opinion (page 788), which is directly in point here:

"In the Nabors Case the question which depended upon whether the lease was a joint lease on the part of the lessors was whether the obligation of the lessee to commence the drilling of a well within a year required commencing drilling within the year on each separate tract of land belonging to each lessor. The ruling was that the obligation of the lessee in that respect was in favor of the lessors jointly, and hence that the drilling of a well on one of the areas leased was a compliance with the obligation in favor of the lessors jointly. The corollary is that, in a joint lease, where there is no stipulation on the subject, the obligation to pay the stipulated royalty is an obligation in favor of the lessors jointly, requiring the royalty due from any part of the land to be apportioned between or among the lessors in proportion to the acreage owned by each of them. It would seem very unfair to allow the lessee in such a case to discharge his obligation to all of the lessors jointly by drilling a well on the land of only one of them, and by paying all of the royalty to the one lessor. In the opinion rendered in the Nabors Case, referring to articles 2080 and 2081 of the Civil Code, defining joint obligations and severable obligations, it is said: 'But the Code does not lay down a rule for determining what contracts are joint and what are severable,

except that, when several persons join in the same contract to do the same thing it produces a joint obligation on their part, and that, when an obligation is incurred in favor of several persons for the performance of something for their common benefit, it creates a joint obligation in their favor. Whether a contract is severable or joint depends upon the intention of the contracting parties as revealed by the language of their contract and the subject-matter to which it refers.'"

As to the intention of the parties, we said (page 791):

"There is no reason whatever for believing that Mr. and Mrs. Johnston intended that the result of their contract with the Shell Petroleum Corporation, should not necessarily be for their mutual advantage, but might eventually be for the advantage of only one of them, to the prejudice of the other."

That is precisely the case here. It is unbelievable that plaintiff intended to approve a contract, the result of which would not be to the mutual advantage of both itself and Heyd, but might benefit Heyd only and be prejudicial to it.

In the Shell Petroleum Case, having reached the conclusion that the contract was a "joint lease," we said that by this "joint lease" Mr. and Mrs. Johnston pooled their interests and agreed that each of them should receive half of the one-eighth royalty that might be due from either tract of land.

Our conclusion is that the contract became a joint lease by plaintiff's acceptance

of it and that the parties intended to pool their interests. From this it follows that plaintiff is entitled to a share of the royalties, even though the oil was produced from Heyd's tract.

The following quotation from Thornton on Oil and Gas, vol. 1, 1936 Supplement, chap. II, p. 5, § 62, is in point:

"It is obviously unjust to permit the lessee to hold the entire tract covered by the lease upon payment of the royalty to the owner of the tract containing the well, and thus deprive the other heirs of any part of the consideration for holding the land. It is more consonant with reason and justice, to apportion the rent, thus supplying the consideration for holding the whole tract by drilling a single well."

See, also, Higgins v. California Petroleum & Asphalt Co., 109 Cal. 304, 41 P. 1087, and Lynch v. Davis, 79 W.Va. 437, 92 S.E. 427, L.R.A.1917F, 566.

For the reasons assigned, the judgment appealed from, sustaining the exception of no cause of action and dismissing plaintiff's suit, is reversed and set aside; and it is ordered that the case be remanded to the trial court, reinstated on the docket, and disposed of according to law and the views herein expressed. The costs of the appeal are to be paid by appellees, other costs to await results.

O'NIELL, C. J., did not take part.

LAND, J., absent.