2 So.2d 647

ROBINSON v. HORTON et al.

SAME v. SCHNITT et al.

Nos. 35981 and 35982.

April 28, 1941.

Rehearing Denied May 26, 1941.

Goff, Goff & Caskey, of Arcadia, for plaintiff and appellant.

Seals & Atkins, of Homer, and T. H. McEachern, of Homer, for defendants and appellees.

FOURNET, Justice.

Mrs. Flora S. Robinson instituted two jactitation or slander of title suits, one against A. Schnitt, H. L. Lasker, Sofia Theo, J. K. Theo, and E. D. Rhea, the other against W. H. Horton, M. D. Harris, E. H. Fortson, E. D. Rhea, Mrs. Dollie Kirby Rhea, A. J. Hodges, and L. M. Moffitt, to have the two instruments by which she transferred mineral rights affecting property owned by her in fee to J. A. Watson and to C. G. Watson, from whom the defendants in these two suits deraign their respective titles, and the mesne conveyances thereunder ordered cancelled from the conveyance records of the Parish of Claiborne, because of the non-use of the servitudes transferred thereunder for a period of ten years.

The first mentioned suit was dismissed as to E. D. Rhea and the second was dismissed as to M. D. Harris, E. D. Rhea, and Mrs. Dollie Kirby Rhea. Both suits were converted into petitory actions, the defendants in each case asserting that their rights under the mineral grants sought to be declared extinguished were preserved by virtue of a joint lease or pooling agreement executed on January 4, 1935, by the plaintiff and all of the then mineral owners, including the defendants (or their predecessors in title) in both suits, under the provisions of which contract oil was being produced in paying quantities at the time of the institution of the suits from a well drilled on a portion of the land covered by the lease.

The cases were consolidated for the purposes of trial and were submitted after the introduction of documentary evidence on agreed statements of facts. The trial judge rendered judgments in favor of the defendants, rejecting the plaintiff's demands in both instances, and she has appealed.

Plaintiff, who was the owner in fee of a tract of land situated in Claiborne Parish, comprising 355.33 acres, conveyed to J. A. Watson (from whom the defendants in the first mentioned suit deraign their title) by instrument dated February 3, 1930, "One-Fourth ($\frac{1}{4}$) of the oil, gas and other minerals, in and under and that may be produced from" the NW$\frac{1}{4}$ of the SE$\frac{1}{4}$ of Section 33, Township 20 North, Range 5 West, and to C. G. Watson (from whom the defendants in the second suit deraign their title) by instrument dated February 24, 1930, a like mineral interest in the SE$\frac{1}{4}$ of the SW$\frac{1}{4}$ and the SW$\frac{1}{4}$ of the SE$\frac{1}{4}$ of the same section. On January 4, 1935, she (plaintiff), joined by the then owners of the said mineral interests, including the defendants in both suits or their predecessors in title, executed a lease contract with the United Gas Public Service Company, the Standard Oil Company of Louisiana, and the Sugar Creek Syndicate, Inc., for the development of the 355.33 acre tract of land owned by her. Subsequently, by instrument dated September 2, 1937, the plaintiff confirmed and reaffirmed the lease of January 4, 1935, in all of its terms and conditions.

It is admitted that the lease was kept alive during its primary term by the payment of delay rentals. It is also admitted that on December 29, 1939, the Sugar Creek Syndicate, Inc., A. H. Southern, trustee, and the Triangle Drilling Company, having acquired the lease, began the drilling of an oil well on a portion of plaintiff's land covered by the lease on January 4, 1935. This well was not located on any portion of the property on which rests either of the two servitudes in controversy, but it was located on land covered by the lease, i. e., the land lying in the NE¼ of the SE¼ of Section 32, Township 20 North, Range 5 West. This well was completed on February 8, 1940, as a producer of in excess of 300 barrels of oil a day, which amount was being produced at the time these suits were filed.

Counsel for the plaintiff contends that the lower court erred in holding that the drilling of a well under the terms of the lease "constituted such a use of the servitudes on all parts of the tract so as to interrupt the running of liberative prescription." He argued both orally and in brief that "In order to use a servitude so as to interrupt prescription it is necessary to use it in a manner contemplated by the grant or reservation whereby it was created."

The defendants, on the other hand, contend that since the plaintiff entered into a joint lease with them, pooling her mineral interests with theirs and specifically agreeing that each should receive a pro rata share of the royalty that might be due from any portion of the land, irrespective of where the oil or gas was found, they are entitled to their share of the royalty due

out of the oil produced from plaintiff's property under the terms of the lease, i. e., according to their interest as it appears in proportion to the entire mineral acreage, regardless of whether or not the well is on the property affected by their servitudes.

█ Under the express provisions of the Revised Civil Code and the jurisprudence thereunder, the rights of parties to a contract are to be governed by the intention of the parties thereto, as reflected by the terms thereof, and subject only to the law that controls the subject matter of the contract. Revised Civil Code, Articles 1945–1962; Shell Petroleum Corp. v. Calcasieu Real Estate & Oil Co., 185 La. 751, 170 So. 785; Louisiana Canal Co. v. Heyd, 189 La. 903, 181 So. 439, 116 A.L.R. 1260; Cox v. Acme Land & Investment Co., 192 La. 688, 188 So. 742; and Brown v. Sugar Creek Syndicate, 195 La. 865, 197 So. 583.

In the Heyd case the question was whether or not the plaintiff had any royalty interest in the oil extracted from defendant's tract of land, no well having been drilled on its (plaintiff's) tract. It was argued that " * * * since there was no community, pooling or proportionate sharing clause in the lease, neither party is entitled to any royalty interest in oil produced from the land of the other." In disposing of that issue we said [189 La. 903, 181 So. 442, 116 A.L.R. 1260]: "In all cases where parties owning separate tracts of land execute together one oil and gas lease covering their separate tracts and *where the lease contract contains no community or pooling clause, whether they are entitled to share proportionately in the royalties, regardless of*

*which tract is developed, depends on the intention of the parties.* \* \* \* No hard and fast rule of interpretation can be laid down for determining the intention of the parties in a given case, and no presumption of law arises one way or the other as to their intention from the mere fact that they sign a lease contract together. \* \* \*" (Italics ours.)

In the Acme Land & Investment Company case it was urged that the lease in controversy being a joint lease in which grantees of two servitudes joined the owners of the land, the servitudes became integrated into one and the production of oil and gas on any portion of the land on which the two servitudes rested preserved the servitude granted by the integration of the two on the whole tract. In support of this contention the cases of Nabors v. Producers' Oil Company, 140 La. 985, 74 So. 527, L.R.A.1917D, 1115; and Shell Petroleum Corporation v. Calcasieu Real Estate & Oil Company, 185 La. 751, 170 So. 785, were cited. In disposing of the contention the court stated [192 La. 688, 188 So. 745], the cited cases were authority for the proposition *"that, whether a contract is joint or severable depends upon the intention of the contracting parties, as revealed by the language of their contract and the subject-matter to which it refers,"* concluding that "The language of the lease indicates that the contract is severable and not joint. \* \* \*" (Italics ours.) Continuing, the court said that "It is clear that it was not the *intention* of the lessors that the owners of the minerals in Tract 'A' were to share in the benefits accruing from the production on Tract 'B' \* \* \*," (Italics ours.) and indicated that if the lease had been an unitized or integrated contract providing for the payment of royalties in the proportion of the mineral interest of the various owners to the entire tract under lease, its conclusions would have been different.

In the Calcasieu Real Estate & Oil Company case [185 La. 751, 170 So. 788], this court held that "\* \* \* *in a joint lease,* where there is no stipulation on the subject, *the obligation to pay the stipulated royalty is an obligation in favor of the lessors jointly, requiring the royalty due from any part of the land to be apportioned between or among the lessors in proportion to the acreage owned by each of them."* (Italics ours.) There the Shell Petroleum Corporation, in whose favor G. W. Johnston and his wife had executed a joint lease affecting an 81-acre tract of land belonging to Mrs. Johnston individually and affecting a similar tract of land that belonged to the community existing between Mrs. Johnston and her husband, interpleaded both of them, as well as the parties who had acquired the 81-acre tract of land that had belonged to the community by mesne conveyances from the party who purchased the property at the sheriff's sale when the mortgage on the land was foreclosed, in order to determine who was entitled to the one-eighth royalty of the oil produced from the property formerly belonging to the community by the lessee under the terms of the lease. In disposing of the issues raised we said that under the jurisprudence of this state "It is well set-

tled that the payment of a royalty, under a mineral lease, is the paying of rent," and that "A contract of lease for the production of oil or gas may be made as well for a cash consideration, or for any other consideration, as for the payment of a royalty. And, if the consideration is the payment of a royalty, the royalty is not necessarily one-eighth of the oil or gas that may be produced from the land, but is whatever portion the parties to the contract agree upon. Hence it cannot be said that Mrs. Johnston was entitled to a royalty of one-eighth of whatever oil or gas might have been produced from her 81 acres of land, by virtue of her ownership of the land, or of the mineral rights in the land. She was entitled to only that portion of the oil or gas that a lessee would contract to allow her. In this instance, the lessee agreed to pay her, instead of one-eighth of the oil or gas that might be produced from her 81 acres of land, one-sixteenth of the oil or gas that might be produced from her 81 acres and from the 81 acres belonging to the matrimonial community. * * * It is the one-sixteenth of the lessee's oil or gas that Mrs. Johnston is entitled to— whether the oil or gas comes from her 81 acres or from the 81 acres belonging to the matrimonial community." We concluded that "* * * *by this joint lease, Mr. and Mrs. Johnston pooled their interests, and agreed that each of them should receive half of the one-eighth royalty that might be due from either tract of land * * *." (Italics ours.)

When this case was before us on rehearing we reaffirmed the correctness of the

original opinion and pointed out that under the provisions of the lease found in paragraph 11 thereof it was "'agreed that the estate of either party hereto may be assigned in whole or in part. * * * *It is expressly agreed * * * that regardless of any * * * change or division, said land shall be developed and operated, and all royalties accruing hereunder shall be treated, as an entirety, such royalties shall at all times be divided among and paid to the owners thereof in proportions according to the acreage and/or interest owned by each, and Lessee shall not be required to offset wells on separate tracts or portions of said land nor to furnish upon or as to any such tract or portion separate measuring or receiving tanks * * *.'" (Italics ours.)

In the Sugar Creek Syndicate case [195 La. 865, 197 So. 593], there was a conflict between the rights of the landowners and those who held mineral rights and royalties under them. In order to have the title straightened out the Triangle Drilling Company, which held a lease on the property and was preparing to drill, caused the title to the land to be examined and a joint lease and pooling agreement to be prepared. This was signed by all of the parties in interest. In the document the rights of each party were expressly unitized and each royalty and mineral owner agreed to take that portion of the royalties that his interest bore to the entire acreage covered by the lease, and that percentage was specially designated in a schedule attached thereto. In that case we held that "The land, the mineral, and the royalty owners

having executed a joint lease and pooling agreement and a division order, and the royalties having been paid in accordance therewith, the mineral and royalty interests did not prescribe as long as such payment continued. * * *"

In the instant case it is stipulated in the lease of January 4, 1935, that "It is agreed and understood that the premises leased herein shall, for the purposes of this lease, be considered and treated as owned in indivision by the Lessors and shall be developed and operated as one lease, and all rentals and royalties accruing hereunder shall be treated as an entirety and shall be divided among and paid to Lessors, in the proportion that the acreage (mineral rights) owned by each bears to the entire leased acreage" (Paragraph 17-A) ; that the lessors owned interests in the leased premises in the proportions enumerated opposite their names (Paragraph 17-B) ; that "For the purpose of the development of the premises leased herein, it is agreed and understood that in the event a well should be drilled on the premises covered by this lease capable of producing oil and/or gas in paying quantities, said one well shall be held to be a sufficient and reasonable development of the entire leased premises * * *. It is admitted that Lessee would not have entered into this contract without the inclusion of the provisions of this paragraph" (Paragraph 8) ; and that the lease is for a primary term of five years "and as long thereafter as oil, gas, sulphur or other minerals or any of them is produced from said land by Lessee or the obligations in lieu of production are fulfilled" (Paragraph 2).

Thus it may be seen that the plaintiff and defendants, by entering into the joint lease contract of January 4, 1935, in clear and unambiguous terms unitized or integrated their mineral interests by creating one whole lease in favor of the lessee in order to have the land developed and they are, in turn, to receive royalties from the oil produced from the land in the proportion that their mineral rights bear to the whole, which the lessee obligated itself to pay as long as oil or gas is produced therefrom in paying quantities. They have contracted; they are bound by their contract; and the question of whether the servitudes, owned by the defendants in these two cases at the time of the confection of the contract, were actually used by drilling is immaterial.

For the reasons assigned, the judgment of the lower court is affirmed, at appellant's cost.

O'NIELL, C. J., does not take part.