17 So.2d 891

**A. VEEDER CO., Inc., v. PAN AMERICAN PRODUCTION CO. et al.**

No. 37034.

March 13, 1944.

Rehearing Denied April 17, 1944.

Liskow & Lewis, of Lake Charles, and Rene H. Himel, of Franklin, for appellants.

L. O. Pecot, of Franklin, and K. C. Barkley, of Houston, Tex., for appellees.

ODOM, Justice.

This is a suit to have cancelled and erased from the records of St. Mary Parish a certain mineral lease, in so far as it affects or covers the lands belonging to plaintiff, on the ground that there was no production of oil, gas, or other minerals from plaintiff's land and no drilling operations begun within the primary term of the lease, which was five years from January 2, 1933. Defendants admit that there were no drilling operations begun on plaintiff's land within the primary term of the lease, and admit further that plaintiff's land had not been explored for the production of minerals therefrom up to the time the present suit was filed, although approximately eight years had elapsed between the date of the lease and the filing of the present suit. Defendants alleged—and this is admitted—that, whereas no drilling operations were begun on the lands owned by the plaintiff, such operations had been begun and the production of oil had been obtained on other lands covered by the lease within the five-year primary term; and alleged further—and this is the defense set up in opposition to plaintiff's demands—that under the terms of the lease production of minerals from any of the lands covered by the lease prevented a forfeiture of the lease on the other lands described in the lease contract, including those of plaintiff.

The sole question presented is whether, under the terms of the original lease as subsequently amended, the production of minerals from any portion of the land covered by the lease kept the lease alive as to those portions of the land not developed.

There was judgment in the trial court ordering the lease cancelled in so far as it affected the lands belonging to plaintiff. From this judgment the defendants appealed.

The lease contract here involved is dated July 7, 1932. The primary term of the lease was five years from January 2, 1933, during which term it could be kept alive by the payment of delay rentals. If minerals were produced within the prescribed time, the lease was to remain in full force and effect as long as minerals were produced in paying quantities. According to its recitals, it was executed by the A. Veeder Company, Inc., a corporation organized and existing under the laws of this state, the corporation being the plaintiff in this suit, and by the heirs of John W. Veeder, deceased, namely, Mrs. A. Veeder, widow of Alcide Veeder; George T. Veeder, Winifred Veeder Cocke, wife of E. N. Cocke; Ida M. Veeder, a single woman; Ella Veeder Delahaye, wife of L. H. Delahaye; Aimee Veeder Fusilier, wife of J. O. Fusilier; Lena Veeder Gardner, wife of C. E. Gardner; and J. Earl Veeder, and by George T. Veeder individually, all acting together, "hereinafter called 'Grantor' (whether one or more)". The lease was granted in favor of Roy B. Siler, "hereinafter called 'Grantee'". The lease conferred upon the grantee "the exclusive right to explore *the land hereinafter described* for mineral indications, to drill and mine thereon for oil, gas, sulphur and

other minerals, and to produce and appropriate any or all of the same therefrom". (Italics here and elsewhere are the writer's.)

We quote the following recital from the lease:

"The land is in St. Mary Parish, Louisiana, and is described as follows:

"Thirteen Hundred Thirty Six and 29/100 (1336.29) acres more or less of land out of Township 13, South, Ranges 9 and 10 East, Southeastern Land District, St. Mary Parish, Louisiana in Ten (10) tracts, more fully described as follows, to-wit".

Then follows a minute and specific description of 12 (not 10) smaller tracts of land, all included in, and comprising in the aggregate the whole of, the larger tract of 1336.29 acres in St. Mary Parish.

The fact that the lease was granted, as we have said, by the A. Veeder Company, Inc., by the heirs of John W. Veeder, deceased, and by George T. Veeder, individually, as " 'Grantor' (whether one or more)" gives rise to the inference that the entire tract leased was owned by them jointly and in indivision. However, the original lease dated July 7, 1932, was amended as to description on January 17, 1935. The various smaller tracts described in the original lease were redescribed in the amendment as 15 tracts instead of 12, and it was stated that the A. Veeder Company owned individually 12 of these 15 tracts of land, and that the heirs of John W. Veeder and George T. Veeder owned the other three tracts. We shall discuss this amendment of the lease in detail later in this opinion.

The original lease provides that:

"For the purpose of calculating the payments hereinafter provided for, *the land* is estimated to comprise 1336.29 acres, whether *it* actually comprises more or less. *All land owned by the Grantor* in the above mentioned surveys or sections is included herein, whether properly described above or not."

It provides that the grant shall terminate on January 2, 1933, unless on or before that date the grantee elects, by notice in writing delivered to the *grantor,* "to either drill a well *on some part of the land embraced herein* or to pay to the grantor Two and No/100 ($2.00) Dollars per acre for all of *the land* hereunder". It is admitted that the grantee paid to the landowners $2. per acre, or the sum of $2,672.58, and that this payment would have kept the lease alive to the end of the primary term, or to January 2, 1933. The lease contains the provision that, if the grantee elects to drill *a well,* the grantee shall begin operations for such drilling within 60 days from the date of the lease and shall prosecute such drilling with reasonable diligence to completion or abandonment, in an honest and bona fide effort to "find minerals in paying quantities *in the land*". It further provides that if, prior to discovery "of oil *on the land*", a well producing as much as 200 barrels of oil per day for 30 consecutive days is brought in on adjacent land and within 200 feet "of any line *of the land, then held hereunder*", the grantee shall with reasonable promptness begin, and with reasonable diligence prosecute, the drilling of *"a well* [an off-set well] *on the land,*

*then held hereunder,* in an honest effort to discover oil in paying quantities".

The lease further provides that, after beginning operations "on the land and prior to discovering any mineral in paying quantities thereon", the grantee may maintain its rights in effect so long as it pleases by continuing such operations without lapse of more than 60 days between the cessation of operations on one well and the beginning of operations for drilling another. The lease further provides that:

"After the discovery of any mineral in paying quantities *on the land,* Grantee's rights shall remain in effect so long as any of such minerals are produced in paying quantities *from the land."*

And it provides further that:

"* * * if the grantee fails to reasonably develop *the land* after the discovery of mineral, such failure shall entitle the *grantor* to an action for damages only, and not to a cancellation or termination of Grantee's rights; and Grantee may, if Grantee so elects, after discovering any minerals in paying quantities *on the land,* surrender any part thereof, when after none of the provisions hereof shall be effective as to the surrendered part, but Grantee may continue to hold the unsurrendered part by compliance with the provisions hereof as to the same."

The lease then provides that the *grantor* shall be entitled to royalties of 1/8 of the oil produced and saved, 1/8 of the net profits realized on the natural gas produced and saved, 1/8 of the value of the casinghead gas, and 50¢ for each ton of sulphur marketed. It provides that the "use of the surface of the land" is granted only for the purposes of the lease, and provides that the provisions of the lease shall extend to, and bind, the heirs, successors, and assigns of the parties thereto.

On August 30, 1932, less than two months after the date of the lease, Siler, the lessee, transferred it to John R. Black and A. T. Schwennesen. From Black and Schwennesen the entire interest in the lease passed by mesne conveyances to the Pan American Production Company et al., who are the defendants in this case.

Some, but not all, of the various tracts of land, as described in the original lease and as redescribed in the supplemental agreement, are contiguous. According to the map filed in evidence and brought up in the record, Tracts 1, 2, 3, and 5, as redescribed in the supplemental agreement, are contiguous, and together comprise one block or tract of land containing 423.47 acres, which block or tract is not contiguous to any of the other land covered by the lease. This tract is owned in its entirety by A. Veeder Company, the plaintiff in this case. Tracts 7, 9, and 10 are contiguous and comprise another block or tract which is entirely separated from the other lands. Tracts 8 and 11 are contiguous and form another block of land entirely separated from the other tracts. None of the property owned individually by the A. Veeder Company, plaintiff in this case, has ever been explored for the production of minerals, and no single tract owned by it is contiguous to any of the tracts, owned by others, which have been

explored for, and are now producing, oil or any other mineral.

Clearly there is no question of prescription involved in this case. Counsel for plaintiff say in their brief at page 22: "In our case the question of the ten years prescription is not an issue, for the reasons advanced in the first part of this brief." This is true, and we may state further that no other prescriptive period is involved.

The record shows that on or about May 10, 1937, which was within the primary term of the lease, the Pan American Production Company, as assignee of the Siler lease, began drilling for oil on a portion of the land covered by the lease, but the well was abandoned as a dry hole. It shows further that immediately thereafter the Pan American Production Company commenced drilling another well on the land covered by the lease, and that this well was completed as a producer on December 31, 1937, and that by May, 1938, the company had drilled five wells which were producers of oil. But, as we have stated, none of these wells was drilled on lands owned by the A. Veeder Company individually. Thus, as we have already stated, the sole question involved in this case is whether drilling operations, begun within the primary term of the lease on a part of the land covered by the lease, kept the lease alive as to the tracts of land not drilled.

· A reading of the original lease shows beyond question that it was a joint lease as to both grantors and grantee. It was a joint lease in the true sense. The A. Veeder Company, which is a corporation, and the several individuals who, with the corporation, owned all of the land covered by the lease, all of whom were called " 'Grantor' (whether one or more)", acted as one in granting the lease; they acted unitedly; they bound themselves together as one individual; what one did each and all did. The land covered by the lease was treated as one tract. The recitals and declarations in the lease were not made by the corporation and the individuals separately; they were made unitedly and as one. Acting unitedly and as one, what they, in effect, said to the lessee was that, if he or his assigns should succeed in producing minerals "on the land" in paying quantities, his "rights shall [should] remain in effect so long as any of such minerals are [were] produced in paying quantities from the land". "The land" referred to was the land covered by the lease—not a part of it, but all of it. This was clearly the intent of the parties, as shown by various clauses and phrases in the lease, one of which recites that the grant should terminate on a certain date unless, on or before that date, the grantee should elect by written notice to the grantors "to either drill *a well on some part of the land* embraced herein" or pay grantors a certain sum of money on a certain date. The phrase "on some part of the land embraced herein" clearly means that the development of any part of the land for minerals would perpetuate the lease as to each and every portion of the land covered by the contract. The land covered by the lease was described first as one large tract of 1336.29 acres, which large tract was subdivided for the purpose of description into 12 smaller tracts. The contract repeatedly refers to the property in-

volved as "the land", and, in speaking of minerals, it refers to the minerals "in the land" or "on the land".

The lease provides also that, if a well producing as much as 200 barrels of oil per day for 30 consecutive days is brought in on adjacent land and within 200 feet "of any line of the land, then held hereunder" (meaning, of course, any of the land held under the lease), then the grantee should with reasonable promptness begin, and with reasonable diligence prosecute, "the drilling of a well on the land, then held hereunder". The phrase "within 200 feet of any line of the land" necessarily means the line of any tract of the land, and the phrase "prosecute the drilling of a well on the land, then held hereunder" necessarily means the drilling of one well on any portion of the land. It is provided in the lease that the delay rentals "may be made to Grantor personally or by mailing at Houston, Texas, on or before the due date of the payment letter addressed to the St. Mary Bank and Trust Company of Franklin, La. (or its successor), Grantee's check with instructions to such bank to deposit same to Grantor's credit; such bank being hereby constituted Grantor's agent". The delay rentals were payable in one lump sum to the lessors.

The obligations assumed by the grantee or lessee were to pay the delay rentals during the primary term of five years in order to keep the lease alive for that period of time, or, at his option, to commence drilling operations within that time on any part of the land and to prosecute such operations with diligence and in good faith. If

he (or his successors or assigns) was successful in his operations, and minerals of any kind were produced in paying quantities, then his rights under the lease continued so long as production in paying quantities continued.

This agreement, like all conventional contracts, must be construed as a whole, and the intent of the parties is to be ascertained by what is contained within the four corners of the instrument. A reasonable interpretation of this agreement is, we think, that all parties thereto intended that production from any portion of the land would perpetuate the lease as to every portion of the land as long as production continued in paying quantities. The land covered by the lease was leased as a single tract, and the parties are bound by the contract.

This is not the first time the identical question here involved has been presented to this court. The case of Nabors v. Producers' Oil Co., 140 La. 985, 74 So. 527, 528, L.R.A.1917D, 1115, is on all fours with this one. In that case, four individuals and one corporation, who owned separate tracts of land not contiguous but widely separated, some of the tracts being in one parish and some in another, executed together a mineral lease in which they were referred to as "grantor, whether one or more", in favor of the Producers' Oil Company. The lease covered the land owned by each of the lessors, the aggregate acreage covered being 907.83 acres. The consideration of the lease was $22,694.75, which was paid to the lessors in one lump sum. The lease provided that "Under pen-

alty of forfeiture of the rights and estate hereby granted, operations for the drilling of *a well* for oil or gas should be begun within one year from the time of final execution and delivery of this contract." Paragraph 8 of that lease reads as follows:

"In case the grantee or its successors or assigns should sink *a well* or shaft and discover either oil, gas or other minerals, within the limits of time, or the extension of such as hereinafter provided for, then this conveyance shall be in full force and effect for twenty years from the discovery of said product, and as much longer as such minerals are produced in paying quantities." (Italics are the writer's.)

Within the time prescribed, the lessee selected a location for the drilling of a well, and, said the court, "The well was located on the land of Mrs. Sallie Mag Nabors and W. A. Nabors, described in the lease as the S.E. ¼ of S.E. ¼ of section 25, township 13, range 12, and was known as Grand Bayou Planting Company well No. 1." This first well was abandoned, and another well, known as Grand Bayou No. 2, was drilled on the tract of land belonging to Mrs. Sallie Mag Nabors included in the lease. This well produced oil. No drilling operations were ever begun on any of the other tracts of land. The plaintiffs sued to cancel the lease, and, referring in their petition to Paragraph 8 of the lease (quoted above), they alleged that:

"* * * the parties to the contract contemplated that the grantee or lessee should drill a well on the land of each of the separate owners, within a year from the date of the contract, or pay each separate owner at the rate of $25 per acre to prevent a forfeiture of the lease of the land belonging to each separate owner."

In summarizing the complaints made by the lessors, the court said that one of them was this:

"That the contract was not joint, but severable, and that therefore, even if the drilling of the well on the land of E. A. Nabors and Mrs. Sallie Mag Nabors prevented a forfeiture of the lease as to their land, it did not prevent a forfeiture of the lease on the lands belonging to the other lessors."

In the course of its opinion, the court said that the force of the above contention depended upon the question whether the lease contract was severable or whether it was joint or entire. The court said: "We agree with the finding of the district judge that the contract is not severable, but joint or entire" (citing Articles 2080 and 2081 of the Revised Civil Code). After citing numerous decisions applicable to the point at issue, the court said:

"Our conclusion is that the provision in the sixth paragraph of the contract, 'operations for the drilling of a well for oil or gas shall be begun within one year,' cannot be construed to mean that operations for the drilling of a well should be begun on the lands of each of the grantors. Hence our conclusion is that the beginning of operations for the drilling of a well on the tract of land belonging to W. A. Nabors and Mrs. Sallie Mag Nabors within the year from the date of the contract prevented a forfeiture of the lease on all of the lands described in the contract."

The ruling in the Nabors case was approved by this court in two recent cases: Shell Petroleum Corporation v. Calcasieu Real Estate & Oil Co., 185 La. 751, 170 So. 785, and Louisiana Canal Co. v. Heyd, 189 La. 903, 181 So. 439, 116 A.L.R. 1260. It was followed in the case of United Gas Public Service Co. v. Eaton et al., La.App., 153 So. 702, which case was approved by this court in the Shell Petroleum Corporation case and in the Heyd case.

We quote the following extract from an annotation found in L.R.A.1917D, p. 1125, under the heading "As to development of leased premises":

"A lease by different owners of different tracts of land as a single tract, with a provision for the payment to the lessors of a designated royalty and for rental money for delay in development, and a further provision for the sinking of a well on the leased premises within a designated time, is a joint lease, and the provision as to sinking a well is complied with by sinking a well upon one of the tracts of land, although the delay or rent money was paid by the lessee to the different owners of the land according to their respective portions of the land. South Penn Oil Co. v. Snodgrass, 1912, 71 W.Va. 438, 76 S.E. 961, 43 L.R.A.,N.S., 848."

See also: 2 Summers on Oil and Gas, Permanent Edition, § 295, p. 131; Thornton, Law of Oil and Gas, Fourth Edition, Paragraph 196, p. 576; Daggett on Louisiana Mineral Rights, p. 96.

As we understand the argument made by counsel for plaintiff, they do not seriously contend that the original lease does not

show on its face that it is a joint lease both as to the lessors and as to the lessee. Their argument is that by the supplemental agreement executed on January 17, 1935, the parties to the original lease interpreted the original lease, and that, when the original lease and the amendment are construed together, it clearly appears that the plaintiff's lands were "not jointly leased to Siler". As relating to this point, they say at page 12 of their brief that all parties, plaintiff and defendants, "have by the documents (P-1 [the original lease and P-3 the supplemental agreement]) * * * so clearly defined the rights of all parties, that we submit that the rights of A. Veeder Company, Inc., are just the same as if—

"On July 7, 1932 [the date of the original lease], the A. Veeder Company, Inc., had executed a separate lease on the first (1st), second (2nd), third (3rd), fourth (4th), fifth (5th), sixth (6th), seventh (7th), eighth (8th), twelfth (12th), thirteenth (13th), fourteenth (14th), and fifteenth (15th) tracts, as such tracts are described in P-2 [P-3], for a primary term of five (5) years, five (5) months and twenty-five (25) days". (The tracts referred to are those which were recognized in the supplemental agreement as belonging to the A. Veeder Company, Inc.) They say further that the rights of George T. Veeder are just the same as if he had on July 7, 1932, executed a separate lease on the tracts of land described in the supplemental agreement as belonging to him, and that the rights of the heirs of John W. Veeder were the same as if they had executed a separate lease on the lands which they owned.

Counsel, we think, are in error as to the purposes of the supplemental agreement, which purposes are clearly shown by the agreement itself and by the resolution of the board of directors of the A. Veeder Company, Inc., made on January 17, 1935, authorizing Mrs. A. Veeder, president of the corporation, to enter into the supplemental agreement.

The supplemental agreement recites that, whereas the A. Veeder Company, Inc., George T. Veeder, and the heirs of John W. Veeder had on July 7, 1932, granted to Roy B. Siler a mineral lease "of certain property in St. Mary Parish, Louisiana", and "which said lease has likewise been assigned and is presently owned by John R. Black and A. T. Schwennesen", and "Whereas, it is now desired by all parties at interest to change the description of said property in said mineral lease to Roy B. Siler, and in said assignment thereof to John R. Black and A. T. Schwennesen so as to more certainly and definitely describe the land leased thereby

"Now, Therefore, in consideration of the benefit mutually accruing to the parties hereto it is agreed that the description hereinabove set out in said mineral lease to Roy B. Siler and the description in said assignment thereof to John R. Black and A. T. Schwennesen hereinabove referred to shall be and are hereby each changed and corrected so as to read as follows, to-wit:

"The land is in St. Mary Parish, Louisiana, and is described as follows:

"Thirteen Hundred Thirty Seven [six] And 29/100 (1337.29) acres more or less

of land out of Township 13, South Ranges 9 and 10 East, Southeastern Land District St. Mary Parish, Louisiana, in Fifteen (15) tracts more fully described as follows, to-wit * * *."

Then follows a redescription of the land in 15 parcels instead of 12, as in the original lease.

This supplemental agreement provides: "The said mineral lease and assignment otherwise remaining unaffected and in full force, effect and validity," and that the lessors (naming each of them) "hereby recognize and confirm the validity of the said lease to Roy B. Siler and the assignment thereof from Roy B. Siler to John R. Black and A. T. Schwennesen, their heirs and assigns."

This agreement further provides that:

"And now because it has been complained that said lease is indefinite as to the right of any assignee thereof, for the purpose of clarifying the same, the above mentioned parties for themselves, their heirs, successors and assigns, now hereby agree that said lease may be assigned by the said John R. Black and A. T. Schwennesen in whole or in part, and that no default by any such assignee or the holder of any part of said lease shall affect the right of any other assignee of any holder of any part of said lease."

The supplemental agreement then provides that the rentals, in whole or in part, which may be paid in lieu of drilling operations under the lease, "are to be paid to the joint account of the various Lessors set out in said lease regardless of the re-

spective interests therein of the respective lessors, it being agreed that such payment to the joint account of the lessors shall be and is hereby accepted as payment to each of said parties individually".

It is further stipulated that the royalties "which may accrue to the benefit of the Lessors in said lease are to be paid separately to the Lessors therein as to the actual record ownership of the various lands therein leased may appear".

The instrument further provides that, "for the purpose of royalty payments which may accrue the land therein leased is presently owned as follows". Then follows a statement of the tracts owned by the A. Veeder Company, Inc., by George T. Veeder individually, and by the heirs of John W. Veeder.

The resolution of the board of directors of the A. Veeder Company, Inc., authorizing Mrs. A. Veeder, president of the corporation, to · execute the supplemental agreement on behalf of the corporation, specifically states the purposes of the amendment to be as follows:

"1. To more specifically describe the land therein leased.

"2. Providing that said lease may be assigned in whole or in part.

"3. Acknowledging that said lease is now in full force and effect.

"4. That rentals in whole or in part paid in lieu of drilling operations may be paid to the joint account of all lessors without regard to their respective interests in said rentals.

"5. That royalties which may accrue under said lease are to be paid to the respective record owners of the land from which such royalties may respectively be produced."

The intent of the parties to this supplemental agreement is too clearly stated to be misunderstood. First of all, the parties desired to, and did, change the description of—or "more specifically describe"—the property "in said mineral lease to Roy B. Siler" and in the assignment thereof to Black and Schwennesen. But no property was added to, or taken away from, the large tract of 1336.29 acres covered by the lease. In the original lease the large tract was subdivided into 12 lots. In the supplemental agreement the tract was subdivided into 15 lots. But the large tract of 1336.29 acres, which was divided into 15 lots by the supplemental agreement, is the identical tract which was divided into 12 lots in the original lease. In the supplemental agreement it is said that "The land is in St. Mary Parish, Louisiana, and is described as follows". Then follows a description of the large tract, which description is identical with that in the original lease. In the supplemental agreement the tracts described in the original lease as Tracts 1, 2, 3, 9, 10, 11, and 12 were redescribed as Tracts 1, 2, 3, 4, 5, 6, 7, 8, 12, 13, 14, and 15, and the latter were recognized to be the property of the A. Veeder Company, Inc. The tract described as Tract 4 in the original lease was redescribed as Tracts 9 and 10, Tract 9 being recognized as the property of ·George T. Veeder and Tract 10 as the property of

the eight heirs of John W. Veeder. The tracts described in the original lease as Tracts 5, 6, 7, and 8 were redescribed as Tract 11, having an area of 420.31 acres. The north half of this tract was recognized as the property of George T. Veeder, and the south half as the property of the eight heirs of John W. Veeder. It was recognized that one of the eight heirs owned a 7/28 interest and each of the others a 3/28 interest in Tract 10 and in the south half of Tract 11.

In the original lease there was nothing to show whether the large tract of 1336.29 acres was owned by the lessors jointly and in indivision or whether certain portions of it were owned by the lessors individually. The supplemental agreement, in which the property was redescribed, made it clear that the land covered by the lease was not owned by the lessors in indivision, and that the total acreage covered by the lease was comprised of 15 smaller tracts owned separately by the certain individuals who made themselves parties to the lease. But evidently the parties did not intend that the supplemental agreement have the effect of changing the nature or character of the original lease in so far as either the lessee or they themselves were concerned. They made this clear by writing into the agreement immediately following the redescription of the land a clause reciting: "The said mineral lease and assignment otherwise remaining unaffected and in full force, effect and validity", and another clause reciting that the lessors "hereby recognize and confirm the validity of the said lease to Roy B. Siler". The original lease

was left "unaffected". The obligations, rights, privileges, and duties of the parties to the original lease were left unchanged.

The same may be said of the other provisions in the supplemental agreement. There seems to have been some doubt in the minds of the parties as to whether the original lessee was given the right to assign the lease. In the supplemental agreement it was specifically provided that the lease might be assigned, and the assignment of it by Siler to Black and Schwennesen was specifically recognized and approved.

Another provision in the supplemental agreement was that the delay rentals were to be paid "to the joint account of the various Lessors set out in said lease without regard to the respective interests therein of the respective lessors". This shows beyond question that the lessors did not intend to convert the original lease into three separate leases, as contended by counsel for plaintiff.

Another provision of the supplemental agreement was that the royalties which might accrue under the lease were to be paid to the respective record owners of the land from which such royalties might be produced. The original lease contained this stipulation as to the payment of royalties: "The oil royalty shall be delivered to Grantor, free of expense at Grantor's option either at the well or to Grantor's credit into any pipe line connected with the well." The purpose of the supplemental agreement as it related to the payment of royalties evidently was to avoid any con-

fusion as to the question whether the lessors intended to pool their interests in the royalties so that all might share ratably in the royalties accruing under the lease regardless of which tract or tracts were developed. Such confusion arose in the Eaton case, supra, where two individuals executed a joint lease on their separate tracts of land, and it was held that whether the owner of a tract not developed under the lease was entitled to a share of the royalties accruing from development on the tract owned by the other party depended upon whether the parties intended to pool their interests in the royalties. Similar confusion arose under the lease contracts in the cases of Louisiana Canal Co. v. Heyd and Shell Petroleum Corporation v. Calcasieu Real Estate & Oil Co., cited supra. Evidently the parties to the lease involved in the case at bar intended to avoid such confusion.

Our conclusion is, and we hold, that the parties to the supplemental agreement did not intend to change the nature or character of the original lease, which, as we have stated, was a joint lease, and that as the parties bound themselves under the original lease they remain so bound. If each of the provisions found in the supplemental agreement had been written into the original lease, it would still have been a joint lease under the ruling in Nabors v. Producers' Oil Co., supra.

For the reasons assigned, the judgment appealed from is reversed and set aside, and it is now ordered that plaintiff's demands be rejected and that its suit be dismissed at its cost.