391 So.2d 485 (1980)
Cyrus W. FRAZIER, Plaintiff-Appellee,
v.
JUSTISS MEARS OIL COMPANY, INC., Defendant-Appellant.
No. 14290.
Court of Appeal of Louisiana, Second Circuit.
October 28, 1980.
Writ Refused December 15, 1980.
Garahan & Wilson by Joseph Wilson, Jena, for defendant-appellant.
Cameron C. Minard, Columbia, for plaintiff-appellee.
Before HALL, MARVIN and FRED W. JONES, JJ.
*486 MARVIN, Judge.
Defendant appeals a judgment cancelling the effect of defendant's oil and gas lease on 100 of the 160 acres leased. We find that the lower court erred in concluding that the defendant-lessee failed to diligently develop the leased property as a reasonably prudent operator and reverse the judgment. LRS 31:122.
Plaintiff landowner leased the 160 acres to defendant Justiss Mears on a Bath form La. Spec. oil, gas and mineral lease 14-BR1-2A-PX 10-65 for a primary term of five years and for
"... as long thereafter as ... oil, gas, sulphur or other minerals is produced from said land ..."
The lease form did not contain the Pugh clause, but the lessee was nevertheless obligated by law to perform the contract in good faith and to develop and operate the leased property as a reasonably prudent operator for the mutual benefit of the lessor and lessee.[1] § 122, supra. This obligation, of course, will vary with the circumstances, of each case and with whether the development is to be directed toward a proven formation or toward an unproven formation. See Carter v. Arkansas Louisiana Gas Co., 213 La. 1028, 36 So.2d 26 (1948). See also and compare Nunley v. Shell Oil Company, 76 So.2d 111 (La.App. 2d Cir. 1954); Dupree v. Relco Exploration Co., Inc., 354 So.2d 1083 (La.App. 2d Cir. 1978); Vetter v. Morrow, 361 So.2d 898 (La.App. 2d Cir. 1978); Saulters v. Sklar, 158 So.2d 460 (La.App. 2d Cir. 1963).
In any event, the burden of proving grounds for the cancellation of a mineral lease is on the lessor. Cox v. Cardinal Drilling Company, 188 So.2d 667 (La.App. 2d Cir. 1966).
All of the circumstances of the particular case should be considered in determining whether the lessee has breached the obligation. Especially pertinent are the six factors mentioned in Vetter:
Geological data;
Number and location of wells drilled on or near the leased property;
Productive capacity;
Cost of drilling compared with profit reasonably expected;
Time interval between completion of last well and demand for additional operations, and
Acreage involved in the lease under consideration.

GEOLOGICAL DATA
Proven production in the immediate area of plaintiff's 160 acres is from the Wilcox formation which ranges generally between XXXX-XXXX feet below the surface. Two dry holes had been drilled in the immediate area before the Wilcox proved productive of gas in late 1972. The discovery well (Hadden) was drilled by Justiss-Mears and a 200 acre production unit (Hadden A) was established to the south of plaintiff's land. Justiss-Mears then completed a well on plaintiff's land to the same formation and a second 200 acre production unit (Hadden B) was ordered by the Commissioner of Conservation. The second unit contains 60 acres of plaintiff's leased property. A third production unit was created in 1977 to the southeast (Hadden C). Several dry holes were drilled in the area before and after plaintiff leased his property. Justiss-Mears drilled many of these dry holes and participated in other dry holes. This map depicts the mineral exploration activity in the immediate area:
*487 
The only geological expertise offered at the trial was by defendant. Defendant's geologist testified that any drilling on plaintiff's property would prove dry because of a down-dip in the subsurface reservoir, that the production from this reservoir *488 was declining, and that production from the Wilcox formation (Hadden sand) was not very profitable. The unit well on plaintiff's property here produced $200,000 in revenue since production began, $10,000 of which has been paid to plaintiff. When production declines to the extent that it no longer is economically feasible to operate the well, defendant plans to drill a substitute well on the unit in an effort to obtain maximum recovery of the gas in the reservoir. The cost of drilling a well to the required depth is approximately $65,000.
Other dry holes were drilled in the area as late as 1978 to further verify the opinion of defendant's geologist.
Plaintiff made the demand on defendant for diligent development in a letter dated January 15, 1979. On February 20, 1979, defendant "farmed out" the remaining 100 acres of plaintiff's lease to Spooner, who drilled several wells in the area. At the top of the predicted reservoir and just below the southern boundary of the 100 acre portion of plaintiff's property, Spooner drilled a well to the Hadden sand in accord with the farm-out agreement. This well was dry, further proving the validity of the opinion of the defendant's geologist. The farm-out agreement was executed before plaintiff filed suit and the well was drilled less than a month after plaintiff filed suit and before trial. It is shown that defendant has directly participated in the drilling of 25 wells in the area, 16 of which have been farm-outs. Only three of the 25 wells have proved productive.
Plaintiff contends that because defendant released a lease on other property in the area within six months of plaintiff's demand, defendant was arbitrary in not releasing plaintiff's 100 acres, especially since defendant believes the area to be unfit for further development. We are not shown that the other lease contained a Pugh clause or that its subsurface is comparable to plaintiff's subsurface. Plaintiff also overlooks the fact that after the other lease was released, the defendant became aware of and began to participate in the preliminaries of a play by a major oil company for one or more tests to a much deeper, but unproven, depth in an area which would include plaintiff's land, and for that reason declined to release plaintiff's acreage. Defendant had participated in other deep tests near this area at an earlier time. The drilling of a well to the desired deep depth will cost more than $1,000,000. Defendant's geologist said it would be desirable that the venturer who conducted a deep test have about 6,000 acres in a bloc to make the test and cost of production economically feasible.
The trial court partially cancelled defendant's lease because of "fairness and equity" and because plaintiff was not aware that he perhaps could have had a Pugh clause made a part of the lease. The trial court did not make factual findings supporting the judgment, apparently because there were no circumstances presented which would justify disregarding the evidence submitted by defendant.
These circumstances weigh heavily in support of defendant-lessee and against cancelling the lease:
Production from the Hadden sand of the Wilcox formation in the area of plaintiff's property is not extremely profitable and is declining.
It is most probable that any additional well(s) on plaintiff's 100 acres will not prove productive from the Wilcox.
The 100 acres under consideration is in fact held by production from the unit well on the remaining 60 acres of the leased property in accord with the terms of the lease.
Defendant is not in breach of its obligation to diligently develop the leased property insofar as the proven Wilcox formation is concerned. Defendant's participation in the preliminary play to an eventual deep test in the area fulfills, under the circumstances presented, its obligation to diligently develop the leased property as to unproven formations of greater depth.
The fact that others may have offered to lease from plaintiff the 100 acres under consideration in the event the 100 acres is *489 released from defendant's lease, especially in the absence of a firm obligation to drill a well on the 100 acres, is not sufficiently persuasive to uphold the judgment.
At plaintiff's cost, here and below, judgment is REVERSED and rendered in favor of defendant, and,
IT IS HEREBY ORDERED that the demands of plaintiff are hereby rejected at plaintiff's cost.
NOTES
[1] This clause reads to this effect:

In the event a portion of the leased property is pooled or unitized with other land to form a production unit, operations on or production from such production units will maintain this lease in force and effect only as to the portion of the leased property included in such units. See Fremaux v. Buie, 212 So.2d 148 (La.App. 3d Cir. 1968).