608 So.2d 1019 (1992)
Hugh R. GOODRICH, Priscilla Goodrich Rea, and Thomas E. Berry, Plaintiffs-Appellees, and
Fielding Lewis Cocke, Camille Cocke Patton, Tamara Cocke Jenkins, Caroline Hoff, Carol C. Hoff, Stuart Lewis Hoff, and Reuben H. Hartman, Intervenors-Appellees,
v.
EXXON COMPANY, USA, Defendant-Appellant.
No. 91-88.
Court of Appeal of Louisiana, Third Circuit.
October 6, 1992.
Rehearing Denied December 8, 1992.
*1021 Mary Anna Robinson, and Liskow & Lewis, Gene Lafitte, John King, New Orleans, for defendant/appellant.
Jack C. Caldwell, Lafayette, Gordon, Arata, McCollam & Duplantis, John M. McCollam, New Orleans, for plaintiff/appellee.
Patrick T. Caffery, New Iberia, for defendant/appellee.
Before DOMENGEAUX, C.J., and COREIL[*] and PATIN[*], JJ. Pro Tem.
*1022 DOMENGEAUX, Chief Judge.
Hugh R. Goodrich, Priscilla Goodrich Rea, and Thomas E. Berry sued Exxon Company, USA for partial cancellation of an oil, gas, and mineral lease granting to Exxon as lessee a mineral servitude encompassing land located on the west flank of the Weeks Island salt dome in Iberia Parish. Fielding Lewis Cocke, Camille Cocke Patton, Tamara Cocke Jenkins, Caroline Hoff, Carol C. Hoff, Stuart Lewis Hoff, and Reuben H. Hartman intervened in the suit and are aligned with the plaintiffs. The lease, dated September 16, 1942, was granted by R.H. Goodrich and W.H. Cocke to Humble Oil and Refining Company. Plaintiffs are the heirs of R.H. Goodrich; intervenors are the heirs of W.H. Cocke; and Exxon is the successor-in-interest to Humble Oil and Refining Company. In addition to partial cancellation of the subject lease, plaintiffs and intervenors also sought damages and attorney's fees.
After a bench trial, judgment was rendered in favor of plaintiffs and intervenors (hereinafter referred to collectively as "Goodrich"). The trial judge found that Exxon failed to develop the leased property as a reasonably prudent operator, as required by La.R.S. 31:122 (La.Mineral Code Art. 122). The lease was partially cancelled, and in accordance with lease provisions, Exxon was allowed to retain 40 acres around each well which was producing or being drilled or worked on at the time suit was filed. Damages were not awarded; attorney's fees were awarded to plaintiffs, but not to intervenors.
Exxon appealed and Goodrich answered the appeal. After a thorough review of the voluminous record, we affirm in part, reverse in part, amend, and remand.
The record discloses the following facts which are not disputed. On September 16, 1942, R.H. Goodrich and W.H. Cocke granted a mineral lease to Humble, encompassing approximately 686 acres located on the west flank of the Weeks Island salt dome. By 1976, Humble (now Exxon) had drilled 27 wells on the leased acreage: 12 dry holes and 15 oil producing wells. Over the years, many of these wells were sidetracked, worked over, and recompleted. Additionally, numerous wells were drilled on surrounding property which affected the leased acreage to the extent that new geological data was available for further development of the lease, and that leased acreage was unitized with adjoining, oil producing property. Exxon drilled no new wells on the leased property subsequent to 1976.
In addition to the wells drilled by Exxon, six wells were drilled by Shell Oil Company on land owned in indivision by the Goodrich family, the Cocke family, and the Smith family. The Smith interest is leased to Shell, whereas the Goodrich and Cocke interests are subject to the lease at issue herein. Accordingly, Exxon participated in the six wells as a joint operator. The last well drilled prior to the filing of this suit was the Shell Smith/Goodrich/Cocke No. 6, drilled in 1979.
In 1982, the Goodrich family wrote to Exxon demanding further development of the leased acreage. Exxon replied that it was engaged in an extensive field study, expected to be completed in May of 1983, which would hopefully turn up additional drilling opportunities. After further communication and a meeting between Goodrich and Exxon representatives, Goodrich concluded that Exxon had no specific plans to further develop the lease. Suit was filed on November 8, 1983.
The trial of this matter lasted approximately 30 days over the course of a year and a half. The trial judge resolved the fundamental factual question of whether Exxon breached its obligation to develop the leased property as a reasonably prudent operator in favor of Goodrich. He ordered the horizontal cancellation of the lease, less and except those areas located within 40 acres of the bottom hole of each producing well to the base of the deepest producing sand. The 40 acre retention areas were specifically provided for in the Goodrich lease; subsequent to the trial court's ruling, the parties agreed upon the configuration of each retention area. Also excepted from cancellation were those areas presently held by unitized production.
*1023 In addition to ordering partial cancellation of the Goodrich lease, the trial court awarded plaintiffs attorney's fees in the amount of $215,000 and expert witness fees in the amount of $88,000. The intervenors' claim for attorney's fees was denied as was the claim for damages asserted by both plaintiffs and intervenors.
On appeal, Exxon raises numerous assignments of error pertaining to the trial court's factual findings and certain evidentiary rulings, alleged improprieties in the remedy fashioned by the trial court, and an allegedly excessive award of attorney's fees. Exxon also contends the judgment rendered with respect to the interests of the intervenors was premature and therefore in error. Finally, Exxon asserts for the first time in this appeal its right of litigious redemption under La.C.C. Art. 2652 in regard to a portion of the interests of the intervenors.
Plaintiffs and intervenors answered the appeal contesting certain portions of the trial court's judgment relating to the 40 acre retention areas, the refusal to award damages, the reasonableness of the award of attorney's fees, and the refusal to award attorney's fees to intervenors.

LEGAL PRECEPTS
Article 122 of the Mineral Code requires a mineral lessee to develop and operate the property leased as a reasonably prudent operator for the mutual benefit of himself and his lessor. In Taussig v. Goldking Properties Co., 495 So.2d 1008 (La.App. 3d Cir.1986), writ denied, 502 So.2d 111 (La. 1987), this court addressed the legal principles which govern mineral leases. Relying on the provisions of the Mineral Code and Louisiana jurisprudence, we noted that to fulfill the development duty under the law, a lessee has the obligation to develop known mineral producing formations in the manner of a reasonable, prudent operator and must explore and test all portions of the leased premises after discovery of minerals in paying quantities in the manner of a reasonable, prudent operator. 495 So.2d at 1014; Vetter v. Morrow, 361 So.2d 898 (La.App.2d Cir.1978). We further stated that public policy dictates the necessity of the principle of reasonable development to give effect to the parties' intent in confecting a mineral lease, to assure the reasonable development of Louisiana's natural resources, and to prevent the removal of property from commerce. 495 So.2d at 1014; Dawes v. Hale, 421 So.2d 1208 (La. App.2d Cir.1982).
In Carter v. Arkansas Louisiana Gas Co., 213 La. 1028, 36 So.2d 26 (1948), the Supreme Court held that the question of whether a lessee has sufficiently developed the leased property is a factual issue which must be resolved by consideration of the facts and circumstances of the particular case. See also Morrison v. D & L Partnership, 499 So.2d 988 (La.App.3d. Cir. 1986). The jurisprudence has articulated six factors which are especially pertinent in considering whether a lessee has breached his development obligation. Vetter; Frazier v. Justiss Mears Oil Co., Inc., 391 So.2d 485 (La.App.2d Cir.1980), writ denied, 395 So.2d 340 (La.1980); Comment, 27 Tul. L.Rev. 353, at 357-358 (1953). Those six factors are:
Geological data;
Number and location of wells drilled on or near the leased property;
Productive capacity of existing wells;
Cost of drilling compared with profit reasonably expected;
Time interval between completion of last well and demand for additional operation; and
Acreage involved in the lease under consideration.
We will address each of these considerations.

Acreage:
The leased property is comprised of 686 acres located on the west flank of a piercement salt dome. It is rectangular in shape, longer north to south than east to west.

Geological Data:
Five geologists and several engineers testified as to the geology surrounding the subsurface of this salt dome. The salt mass has pushed through the earth's layers, and in this case, has actually pierced *1024 the surface of the land, creating a variety of complex geological formations. Either as a result of, or in conjunction with, the movement of the salt, a shale sheath has formed around the salt and acts as a barrier between the salt and the various layers of oil producing sands and other sediments that surround the dome.
One of the primary disputes among the geologists is the thickness of the shale sheath. Each geologist illustrated in some way his interpretation of the shale sheath after reviewing Exxon's accumulated well data: logs, dipmeters, core samples, paleontological reports, scout tickets, production histories, maps, and other documents. Their interpretations differ as to how far west the sheath extends, how thick it is, and how steep it runs along the side of the salt mass.
In oral reasons for judgment, the trial judge described the differing geological opinions in detail. We quote in pertinent part his characterization of the conflicting testimony:
There is a shale sheath covering the wall of the salt column up to a certain height. There is a question of whether this is diapiric shale. And the best, I think, distinction I have heard in the evidence is that diapiric shale ... comes upward from very low horizons along with the salt and [is] carried up by the shale.... [O]therwise shale sheath is shale that covers the salt and is created by the upward and downward movement of the sediments as the salt forced its way upward. Regardless of whether it's diapiric shale or not, the evidence is that all of the geologists except Mr. Hoz opined that it has considerable thickness, whereas Mr. Hoz tells us that its thickness is some 10 feet to 100 feet depending upon how you interpret his testimony. Regardless, all of the geologists agree that below this sheath is salt and no producing sands.
Of course, there is other shale. There's layers of bedded shale further removed from the dome which again all agree can have producing sands beneath them, but not beneath the shale sheath. All of the experts essentially agree on the location of the salt column but differ on how far west the shale sheath extends. The defendant's experts feel that it extends more to the west than the plaintiffs' do, and also feel that it has a steeper dip as it approaches the salt than the plaintiffs' experts do.
Again, there is no disagreement that the producing sands are water driven or water pressured in that water lies beneath the oil and as oil is extracted the water rises up and ... push[es] the remaining minerals up as high as it's able to. And as these sands are developed and as they approach their termination up dip at or near the salt, it becomes more difficult to target the bottom hole of a well into them because increasingly the salt is up dip, the water is down dip, and the steeper angle closes in the distance between the two effectively.
Therein lies a large part of the differences between the experts on both sides as to the feasibility of drilling the more up dip you get in these sands.

Number and locations of wells drilled:
Exxon has drilled approximately 69 wells on or near the leased property, including original holes, sidetracks, and wells in which Exxon acted as joint operator with another producer. These wells provided significant data for further development of the property. Millions of barrels of oil have been produced from these wells and both Exxon and Goodrich have made millions of dollars from this production over the years.
Most of the producing wells have penetrated the shallow BF-4 sand or the deeper CM series of sands. A few of the wells penetrated the T, U, and V sands which are deep, thin sands relative to the CM series and are considered to be more difficult to accurately drill into because of the presence of the shale sheath.[1]
*1025 Most of the wells drilled on the leased property were drilled to the down dip areas of the target reservoirs as opposed to the up dip locations proposed by the Goodrich experts.

Productive capacity:
The intensity of the dispute before us indicates that both Exxon and Goodrich firmly believe the leased acreage has further oil producing potential. As the trial judge asked, why else would Exxon fight so hard to retain its lessee status?
Goodrich contends that both the CM series and the T, U, V series contain significant quantities of recoverable hydrocarbons which cannot be produced from existing wells. Exxon contends that existing wells will deplete the CM series. Concerning the T, U, and V sands, Exxon admits they contain potential, although the parties do not agree on the magnitude of that potential. Exxon asserts, however, that it has only recently obtained enough data to drill and produce from those sands and could not have done so prior to 1983 when this suit was filed. The record contains scant evidence concerning the possibility of existing wells producing from the T, U, and V sands.

Time:
Exxon drilled the Goodrich No. 26 well in 1976 and acted as a joint operator with Shell in 1979 on the Shell Smith/Goodrich/Cocke No. 6 well. Goodrich's demand for development was made in 1982. Almost a year later, Goodrich contends, Exxon had not initiated any further development in compliance with the demand. Suit was filed in November of 1983, a year and a half after Goodrich's demand.

Cost/Profit Ratio:
The testimony reveals that drilling costs in the early 1980s were high, but those costs were more than offset by the high price of oil in the same period. Exxon contends that the prospects identified by the Goodrich experts would not have been profitable if drilled in the early 1980s because they would have resulted in dry holes or miniscule production. It is apparent, however, that had the prospects been drilled and produced successfully, they would have been profitable.

TRIAL COURT'S FINDINGS
In reaching a conclusion on the factual question of whether Exxon sufficiently developed the leased property, the trial judge commented that he was not in a position to determine which geological interpretations were correct. Indeed, he believed that such a determination would be both impossible and unnecessary. Instead, the trial judge made essentially two factual determinations. First, he concluded that Exxon had no intention of drilling into currently producing CM reservoirs to obtain oil that Goodrich contends is up dip of existing wells and cannot otherwise be produced. Exxon has not and will not develop the lease in this regard. Second, he determined that Exxon had sufficient data to develop the T, U, and V sands by 1983 and, in failing to do so, breached its obligation of reasonable development.
Concerning the up dip CM potential, the Goodrich experts generally agreed that there are bands of the CM sand series to the east of current development which cannot be produced by existing wells due to structural considerations or the mechanics of these water driven reservoirs. The Goodrich experts discussed specific prospects to drill for this potential and all agreed the prospects would be economically feasible, even considering the degree of risk involved. The Goodrich experts did not agree, however, on well locations, the amount of reserves, or the exact location of the shale sheath, at which point the CM series terminates.
Exxon's position on the CM potential is twofold. First, Exxon's experts agreed with the Goodrich experts that the CM reservoirs do contain hydrocarbons in up dip locations. They opine, however, that existing wells will adequately drain up dip locations and anything that does remain unrecovered would not be economically worthwhile to produce from a separate well. They referred to these reserves as the "up dip graveyard," "attic oil," and "a phantom oil field." Second, the Exxon experts *1026 vehemently opposed the specific prospects offered by the Goodrich experts. Across the board, each prospect was condemned as a dry hole, destined to hit the shale sheath or a miniscule amount of oil, each with a 0-2% chance of success. Exxon opposes the release of the up dip acreage for development by Goodrich presumably because of the effect such wells may have on existing wells, although that was not thoroughly discussed.
We turn now to the arguments pertinent to the T, U, and V sands. The trial judge found Exxon failed to reasonably develop these deeper sands by the time suit was filed in 1983. Goodrich contends the deeper sands were evident as early as 1947, and while they were productive on adjoining leases, Exxon never developed them on the Goodrich lease. Exxon argues that the T, U, and V sands were not really known until 1976 and that their development was attempted between 1976 and 1983 by the drilling of new wells and numerous workover and recompletion projects. Exxon asserts its development efforts indicated the T, U, and V sands are not uniformly present on the Goodrich lease, are very complex, and could only be drilled successfully subsequent to 1983 after more data was gathered from other wells.
In ruling against Exxon on these factual issues, the trial judge gave more weight to the testimony of the Goodrich experts and found Goodrich had met his burden of proving by a preponderance of the evidence the grounds for cancellation of the lease.

EXXON'S ASSIGNMENTS OF ERROR

(1)
Exxon first contends the trial court failed to consider significant evidence of development during the years 1976 through 1983. In that period, Exxon drilled six new wells on or near the Goodrich lease, performed 34 recompletion or workover operations, and produced 33 geological maps. The trial judge did not discuss these facts in his reasons for judgment. We find, however, that evidence of these activities is of marginal relevance to the Goodrich demand for development.
First, of the six wells drilled, two were drilled in 1976, one was drilled in 1979 by Shell and Exxon jointly, and three were drilled off the lease in 1976 and 1979. The Goodrich demand was made in 1982, three years after the last well was drilled on or near the lease. Second, the evidence concerning the recompletion and workover operations was sparse. James McConnell, the Exxon geologist working the Weeks Island field at the time of the Goodrich demand, testified that in 1979 the State Lease 743 No. 4, a nearby well, was recompleted from the U sand to the T sand, and in 1982 Shell Oil Company recompleted the Smith/Goodrich/Cocke No. 6 in the V sand. McConnell did not describe other recompletion and workover activities. The specific dates and geological objectives of these activities were not discussed, and the trial judge was unable to determine, as a factual finding, whether these activities constituted reasonable development. The relevance of recompletion and workover activities is a factual determination, not dependent on expert testimony. See Jardell v. Hillin Oil Co., 485 So.2d 919 (La.1986).
Likewise, the 33 maps prepared by Exxon geologists from 1976 through 1983 are not in evidence and their relevance was not established. Given the testimony in the record before us, we find no error in the trial court's failure to discuss the aforementioned evidence.

(2)
Exxon next argues the trial court's characterization of a lessee's duty to develop is erroneous. In ruling for Goodrich, Exxon asserts, the trial judge necessarily found that the prospects identified by Goodrich's experts must be drilled. This was not the conclusion of the trial judge. Rather, he concluded only that potential reserves may exist in the CM and T, U, and V sands, and Goodrich had the right to have that potential explored by 1983. He did not discuss the validity or the likelihood of success of the prospects identified by Goodrich, nor do we. The prospects themselves are superfluous, useful only as a means to particularize and determine the *1027 economic viability of reservoirs suggested in a variety of geological data. The trial judge relied on the proper standard of development, i.e., that the lessee must develop with reasonable diligence or give up the contract. See Carter, supra; Dawes, supra.

(3, 4)
Exxon's next assignments of error are that the trial court failed to give effect to the development standard agreed to by the parties under the intensity clause of the Goodrich lease and erroneously refused to allow in evidence certain letters pertaining to the intensity clause.
The Goodrich lease includes the following language:
In the event that oil and/or gas is discovered and produced in paying quantities on the above described land, Lessee agrees to develop said property to the same degree of intensity as the rest of the field as a whole is developed.
Exxon argues this clause constitutes a stipulation as to what amount of development is reasonable and prudent. Goodrich argues the clause was intended to prevent reservoir drainage by competing wells.
The trial court admitted in evidence certain correspondence between Goodrich and Exxon in which the intensity clause and the lessee's duty to develop were discussed, but other similar correspondence offered by Exxon was not admitted, although it was read by the trial judge. The trial court did allow both sides to present evidence of lease development as compared to field development. Ultimately, the court found the leased acreage was developed to the same degree of intensity as the rest of the field, but that did not constitute reasonably prudent conduct as required by law.
The trial judge found no "clear and unequivocal clause" in the Goodrich lease evidencing an intent by the parties to limit in any way the lessee's duty of reasonable development. In the absence of such a provision, under La.C.C. Art. 2054, the parties are presumed to have agreed to bind themselves to the general law governing mineral leases. Interpreting that general law, the trial judge found that Exxon's development of the leased property, regardless of whether it was developed to the same degree of intensity as the rest of the field, did not, in this instance, constitute reasonably prudent development. We find no error in this determination nor in the evidentiary ruling of the trial court. The intensity clause reflects no clear, unmistakable, unequivocal intent to limit or define the development obligation of the lessee. (Compare Dawes, supra, which held that an acreage retention clause did not limit the lessee's obligations.) Furthermore, the extrinsic evidence proffered by Exxon attempts to establish the intent of the parties by defining legal consequences of the intensity clause quoted above. Such evidence was properly excluded.

(5)
The fifth assignment of error concerns the trial court's ultimate factual finding that Exxon failed to develop the Goodrich lease as a reasonably prudent operator. Exxon addresses this issue by advancing five contentions: Exxon's response to Goodrich's demand for development was adequate; the up dip reserves of the CM series had been prudently developed; the development of the T, U, and V sands progressed as fast as the geological data allowed; workovers and recompletions constitute development; and Exxon geologists continually studied the leased acreage.
In his reasons for judgment, the trial judge sharply criticized Exxon's handling of the Goodrich demand for development. Essentially, the trial judge concluded that Exxon basically ignored the demand, "hoping [it] would go away." Exxon admits it was hesitant to disclose any of its development plans to Goodrich because the Goodrich family owns an oil and gas exploration and development company in competition with Exxon. We find the actions of Exxon in this regard are irrelevant; the only response relevant to the Goodrich demand would have been the initiation of further development which Exxon did not undertake. We further find, however, that the ruling of the trial judge does not rest solely on his critique of Exxon's response. Accordingly, *1028 we need not comment further on the lack of communication by Exxon.
We turn now to the lower court's conclusion that the deep T, U, and V sands, as well as the up dip reserves of the CM series, have not been prudently developed. We have reviewed the volumes of testimony elicited on these issues and have previously discussed herein the pertinent arguments presented by the parties. We have also analyzed the six factual considerations relevant to a lease cancellation decision, which analysis is summarized below. The trial judge gave more credence to the expert testimony presented by Goodrich than that presented by Exxon. He did not consider relevant the recompletion, workover, and mapping activities of Exxon, which were not described with any specificity. He concluded that Goodrich had met the burden of proof required for partial cancellation of a mineral lease.
Finding no manifest error in this conclusion, we affirm the partial cancellation of this lease. The geological data reveals that there is great potential for the continued profitable production of oil and gas from the leased property, although there is disagreement as to the specifics of that potential. While it is true that numerous wells have been drilled on this 686 acre lease, production from many of those wells is diminishing and more wells can be drilled for complete development. Existing wells cannot tap the full potential. Finally, the three year time interval between the last well drilled and the Goodrich demand, plus the absence of development in response to the Goodrich demand, are significant when considered with the aforementioned factors of profitability, untapped potential, and declining production. These six considerations weigh heavily in support of lease cancellation.[2]
The overriding questions which permeated the trial of this matter are what did Exxon know and when did Exxon know it? The trial court found that Exxon "knew" of the CM and T, U, and V potential and had obtained this knowledge by the early 1980s when further development should have been initiated and was demanded. In reviewing the record, we have scrutinized Exxon's actions and find no manifest error in the determination of the trial court. The conclusion that Exxon failed to develop the entire Goodrich lease as a reasonably prudent operator is affirmed.

(6)
The next issue raised by Exxon concerns the propriety of certain rebuttal testimony adduced by Goodrich. In order to rebut the testimony of Exxon's geological experts, Goodrich offered the expert testimony of Ted Hoz who did not testify during Goodrich's case-in-chief. Additionally, 22 new exhibits were admitted into evidence during rebuttal. Exxon contends the testimony of Mr. Hoz and the related exhibits were beyond the scope of proper rebuttal.
The trial judge has broad discretion to determine the scope of proper rebuttal. In the case of Mr. Hoz, he chose to critique the testimony of Exxon's experts by comparing it to his own geological interpretations. The trial judge considered this a proper method of rebutting the defense evidence. Given the interpretive and inherently disputatious nature of the scientific testimony presented, we find no abuse of the trial court's discretion in allowing the testimony and exhibits of Ted Hoz.[3]

(7)
There is merit to Exxon's seventh assignment of error which pertains to the 40 acre retention areas surrounding each well operating at the time this suit was filed. The trial court concluded that Exxon was entitled to retain 40 acres around each of eight identified wells in accordance with *1029 paragraph 8 of the Goodrich lease which provides:
In case of cancellation or termination of this lease for any cause, Lessee shall have the right to retain under the terms hereof 40 acres of land around each well producing, being worked on, or drilling hereunder, such tract to be designated by Lessee in as near a square form as practicable. And in the event Lessor considers that operations are not being conducted in compliance with this contract, Lessee shall be notified in writing of the facts relied upon as constituting a breach hereof and Lessee shall have 30 days after receipt of such notice to comply with the obligations imposed by virtue of this instrument.
Exxon contends the trial court erred in its ruling that each 40 acre retained area would be subject to a separate lease maintenance obligation under which Exxon must conduct further operations on each retained tract when the specified well for that tract ceases production. The trial judge established a 90 day period for the commencement of such operations, in spite of the shorter period provided in the lease.
The trial court's ruling ostensibly complies with paragraph 8 of the Goodrich lease. Upon further scrutiny, however, we conclude the ruling contravenes the contractual obligations agreed to by the parties. The lease provides that in the event of partial cancellation, the lessee may retain, under the terms of this lease, certain 40 acre areas. In other words, the lease remains in effect as to certain acreage and it is cancelled as to certain acreage. New leases are not created; new obligations are not incurred. Rather, the lease is severed, and one part is cancelled while another part remains in effect. See Fontenot v. Sunray Mid-Continent Oil Co., 197 So.2d 715 (La.App. 3d Cir.1967), writ denied, 250 La. 898, 199 So.2d 915 (1967) and Sellers v. Continental Oil Co., 168 So.2d 435 (La. App. 3d Cir.1964). The lease no longer covers a contiguous 686 acre area. It now covers a series of 40 acre tracts, all of which fall under one maintenance obligation. Accordingly, we reverse that portion of the trial court's judgment which provides for separate lease obligations on each retained area.

(8)
Exxon's next contention is that the trial court erred in cancelling the Goodrich lease with respect to fully developed areas. Exxon argues that its rights under the lease should not terminate merely because there are no minerals on certain portions of the lease, whether those portions have been depleted of minerals or have never contained minerals. This argument is without merit. Exxon's rights have been partially terminated as a result of its failure to reasonably develop certain areas of the lease. If Exxon believes that minerals have already been depleted or never existed in certain areas, then Exxon will not further develop those areas and its rights are thereby lost. Wier v. Grubb, 228 La. 254, 82 So.2d 1 (1955); Middleton v. California Co., 237 La. 1039, 112 So.2d 704 (1959). The trial court found that Exxon, as a result of its geological interpretations, had no intention of further developing portions of the leased premises. His decision to cancel the lease as to those areas was correct.[4]

(9)
We turn now to Exxon's argument concerning unit sands produced from off-tract wells. In fashioning its remedy of partial lease cancellation, the trial judge allowed Exxon to maintain its lease as to those unitized sands located on the leased property which are produced from wells located on lands adjoining the leased property. Exxon contends the judgment should specifically except from cancellation not only the unitized sands, but also "all depths from the surface of the earth to the base of the unitized sand," as was provided in the judgment for producing wells located on the lease. Goodrich argues that only the unitized sands should be excepted from *1030 lease cancellation because off-tract wells may not have tested the shallower depths.
A drilling unit, as established by the Commissioner of Conservation, is the maximum area which may be efficiently and economically drained by one well. La.R.S. 30:9B. One well can drain more than one sand. The off-tract unit wells, then, may have the capacity to drain the shallower sands known to exist within the unitized acreage.
After reviewing the judgment and the reasons for judgment, we are unable to ascertain whether the trial judge intended to except from lease cancellation just the unitized sands, or all depths from the surface of the earth to the base of the unitized sands.[5] Therefore, we remand for clarification. The trial judge has wide discretion to fashion an appropriate remedy in this situation, and he may have justification for the apparent inconsistency between acreage unitized with off-tract wells and that surrounding on-tract wells, although we cannot say what that justification may be.

(10)
Exxon's next assignment of error concerns the failure of the trial court to except from lease cancellation the Smith/Goodrich/Cocke No. 9 well and surrounding acreage. The Smith/Goodrich/Cocke No. 9 well was a successful well drilled in 1984. Because the well was drilled after the plaintiffs' original petition was filed in 1983, the trial court concluded the well could not be considered as evidence of Exxon's lease development. Exxon questions this conclusion because in 1984 there was no judicial demand for cancellation as to the acreage upon which the well was drilled or the depth to which it was drilled.
The record reveals the following facts: The plaintiffs' original petition was filed on November 8, 1983, and sought cancellation as to depths below the deepest well drilled on the leased premises. The Smith/Goodrich/Cocke No. 9 well was drilled in 1984 to a depth of 10,875 feet. The deepest well on the lease was drilled in 1952 to a depth of 12,010 feet. In 1986, plaintiffs filed an amended petition seeking cancellation as to all portions of the leased premises lying below the base of all unitized sands. The No. 9 well falls into this category. Goodrich contends the amended petition relates back to the date of filing of the original petition and effectively includes the No. 9 well in its demand for cancellation.
The trial judge erred in failing to exclude the No. 9 well and surrounding acreage from lease cancellation. First, counsel for Goodrich, with absolute clarity, informed the trial court that the No. 9 well was not to be included in the requested partial lease cancellation.[6] His present claim, and the trial court's ruling, cannot be reconciled with his commentary before the court.
Second, Article 1153 of the Code of Civil Procedure does not allow an amended pleading to relate back to the date of filing the original pleading when the amendment does not arise out of the conduct set forth in the original pleading. In his original petition, Goodrich alleged Exxon's failure to develop certain depths; in his amended petition, he alleged Exxon's failure to develop other depths. This amendment refers to further inaction (i.e., conduct) on the part of the lessee and essentially states a new and expanded cause of action. It cannot relate back to the original petition.
Third, Exxon acted fully within its rights as a lessee in participating with Shell in the No. 9 well. Merely because a suit has been filed seeking partial lease cancellation does not mean that Exxon must give up its rights under that portion of the lease not sought to be cancelled. Indeed, Exxon would have been remiss had it ceased all development efforts on the entire lease.
*1031 Accordingly, we amend the judgment of the trial court to exclude 40 acres surrounding the Smith/Goodrich/Cocke No. 9 well from lease cancellation and we remand for a determination of the configuration of the 40 acre retention area. We cannot, however, accept the corollary argument of Exxon that the No. 9 well, and a nearby dry hole, the Smith/Goodrich/Cocke No. 7 well, should constitute reasonably prudent development of the T, U, and V sands. The evidence supports only the conclusion that the Nos. 7 and 9 wells developed a portion of the leased premises, which portion is to be quantified juridically in a 40 acre retention area.

(11)
Exxon asserts for the first time in this appeal its right to recover the costs of recompleting the Smith/Goodrich/Cocke No. 6 well which were incurred in 1986. Exxon has presented no evidence as to those costs and we therefore decline to comment on the merits of this claim.

(12)
The next issue raised by Exxon pertains to the intervenors, heirs of W.H. Cocke, who own a one-half interest in the leased property. Exxon contends the Cocke heirs never made a proper demand for development and the lease cannot be cancelled as to their undivided one-half interest. Both the Goodrich lease and Article 135 of the Mineral Code require a lessor to put his lessee in default before filing suit for lease cancellation for failure to develop. In Taussig, supra, we reiterated the long standing rule that a formal placing in default is required before judicial intervention may be sought. We also held that a demand for lease cancellation is not equivalent to a demand for development.
The record indicates that the Goodrich heirs, the plaintiffs, did put Exxon in default, while the Cocke heirs, the intervenors, did not. The trial judge ruled that the action of the plaintiffs inured to the benefit of the intervenors and they did not have to separately put Exxon in default.
We find no manifest error in the trial court's conclusion. In A. Veeder Co. v. Pan American Production Co., 205 La. 599, 17 So.2d 891 (1944), the Supreme Court held:
A reading of the original lease shows beyond question that it was a joint lease as to both grantors and grantee. It was a joint lease in the true sense. The A. Veeder Company, which is a corporation, and the several individuals who, with the corporation, owned all of the land covered by the lease, all of whom were called "`Grantor' (whether one or more)", acted as one in granting the lease; they acted unitedly; they bound themselves together as one individual; what one did each and all did. The land covered by the lease was treated as one tract. The recitals and declarations in the lease were not made by the corporation and the individuals separately; they were made unitedly and as one.
17 So.2d at 894. Melancon v. Texas Co., 230 La. 593, 89 So.2d 135 (1956) also supports the conclusion that joint mineral lessors should be treated as one. There, a lease was cancelled as to all persons having an interest, even those who were joined in the suit as defendants, as the intervenors were originally joined herein.
In addition to this jurisprudence which clearly supports the trial court's decision, we refer briefly to the Comment to La.R.S. 31:135 which discusses a well recognized exception to the requirement of a putting in default:
[I]f a party who has breached a contract and would otherwise be entitled to be placed in default either denies the existence of his obligation or refuses to perform it, the damaged party is not required to place him in default as a prerequisite to an action for dissolution or damages, or both. The expression of the decisions is that to require a putting in default in these circumstances would be requiring "a vain and useless thing." This exception is specifically recognized as applicable in mineral lease cases. E.g., Eota Realty Co. v. Carter Oil Co., 225 La. 790, 74 So.2d 30 (1954); Wadkins v. Wilson Oil Corp., 199 La. 656, 6 So.2d 720 (1942). By incorporating the Civil Code rules under Article 135 of the Mineral *1032 Code, it is intended that this judicially evolved exception be preserved as well.
Exxon refused to perform its obligations in response to the Goodrich demand; the intervenors had no reason to believe Exxon would adequately respond to their demand.[7]

(13)
Turning to the question of attorney's fees, we affirm the trial court's award of $215,000 to the plaintiffs. Exxon contends that no attorney's fees should have been awarded because the plaintiffs did not receive the entire relief sought in this suit for partial lease cancellation. Alternatively, Exxon contends the amount awarded is excessive.
Article 209 of the Mineral Code (La.R.S. 31:209) provides that a demand for dissolution of a mineral lease can properly include a demand for attorney's fees. Where partial cancellation is sought and is granted less and except certain unitized acreage or retention acreage, attorney's fees are properly awarded. Goodrich v. Exxon Corp., 642 F.Supp. 150 (W.D.La.1986); Wier, supra. Accordingly, we find no error in the trial judge's decision to award attorney's fees to the plaintiffs.
Additionally, we find no error in the amount of the trial court's award. The trial court conducted a full hearing on the issue and reviewed volumes of time sheets, invoices, and other documents. The plaintiffs paid over a million dollars in fees but acknowledged that amount included payments to multiple attorneys, some from out of town, who may have performed duplicative services. The trial court's decision was thoroughly considered and well within his wide discretion. We affirm.

(14)
The final issue raised by Exxon concerns the right of litigious redemption. Exxon asserts that the intervenors obtained, during the course of this litigation, certain interests in the leased property which they did not own prior to the pendency of this action. Specifically, the exhibits introduced by the intervenors indicate that they purchased from the heirs of Otis and Mayme Massey an undivided 1/12 interest in the leased property in 1988. Also, the exhibits reveal, without specificity as to date or form, that the intervenors acquired all of the succession interests of the legatees of W.H. Cocke, including, apparently, any interest those legatees may have had in the leased property. Exxon asserts for the first time in this appeal the right of litigious redemption set forth at La.C.C. Art. 2652:
Art. 2652. Sale of litigious rights
He against whom a litigious right has been transferred, may get himself released by paying to the transferree the real price of the transfer, together with the interest from its date.
Given the circumstances of this case, we cannot allow Exxon to bring a claim for litigious redemption. First, the intervenors' exhibits were produced during discovery and were introduced at trial in 1989. Exxon did not attempt to assert its claim until the filing of its brief before this court in 1991. The right of litigious redemption must be exercised promptly. Martin Energy Co. v. Bourne, 598 So.2d 1160 (La.App. 1st Cir.1992). Furthermore, La.C.C. Art. 2654 specifically lists the transfer between coheirs or coproprietors as an exception to the provisions of Art. 2652. Accordingly, based on the exhibits before us, which indicate the intervenors are coheirs or coproprietors with the persons from whom they obtained greater interests, *1033 we do not believe Exxon has a valid claim for litigious redemption in this instance.

GOODRICH'S ASSIGNMENTS OF ERROR
We turn now to the issues raised by Goodrich in this appeal. Goodrich first contends the trial court erred in allowing Exxon to retain 40 acres rather than merely the unitized acreage around each producing well. Because most of the units contained within this lease are very small, three to five acres, the partial cancellation sought by Goodrich is significantly greater than that granted by the trial court. Nevertheless, we believe the trial court properly enforced the contractual provisions contained in the lease.
Goodrich urges us to rely on the statutory and jurisprudential description of a unit as a "developed area," La.R.S. 30:9 B; Delatte v. Woods, 232 La. 341, 94 So.2d 281 (1957). He cites Dawes, supra, which held that a 40 acre retention clause included in a 40 acre lease could not be given effect to abrogate the obligation of prudent development. The rationale of Dawes, however, is restricted to its facts. The court held the lessee could not retain "the very same acreage he is alleged to have failed to prudently develop." 421 So.2d at 1212. Further, enforcement of the provision in that case would have ignored the primary cause of the lease because "the 40-acre retention provision ... covers the entire leased property." 421 So.2d at 1212.
While it is true that the acreage retention clause does not limit the lessee's obligation, the decision in Dawes does not require us to ignore the intent of the provision in the case sub judice. The lease herein is substantial, covering 686 acres, and the parties never initiated a change in this lease provision in 40 years. Goodrich has presented no valid justification for disregarding the retention clause.
Goodrich's second contention is that the trial judge erred in including the Goodrich No. 2 well in its list of wells around which Exxon could retain 40 acres. The trial judge concluded that the No. 2 well was being worked on at or around the time this suit was filed. We have considered the pertinent evidence and find no manifest error in this factual determination; accordingly, we affirm the decision of the trial court on this issue.
Goodrich next contends the trial court erred in failing to award damages. The trial judge found insufficient and unreliable evidence to support an award of damages and we agree with this conclusion. Testimony of vague offers to lease and drill wells had the property been available does not constitute evidence of damage for failure to develop a lease. See Allen v. Horne, 478 So.2d 671 (La.App.2d Cir.1985); Frazier, supra.
Turning to the question of attorney's fees, we decline to increase the award made to the plaintiffs for the same reasons we declined to decrease the award as argued by Exxon.
We address finally the denial of an award of attorney's fees to the intervenors. Both the intervenors and the plaintiffs sought attorney's fees under La.R.S. 31:209. The trial court denied the intervenors' claim based on the fact that the intervenors' fees were paid by Goodrich Operating Company, plaintiffs' oil and gas company, under a contractual agreement. The trial court found that "intervenors have neither paid, nor incurred any obligation to pay, any fees to their attorney."
Article 209 of the Mineral Code references Article 207 which provides that the lessee is "liable to the person in whose favor the right or the lease has been extinguished or expired for all damages resulting therefrom and for a reasonable attorney's fee incurred in bringing suit." In finding for Exxon on this issue, the trial judge concluded that if no fee is incurred, then no fee is owed by the lessee. The intervenors contend, however, that neither the statute nor the applicable jurisprudence suggests that attorney's fees must be paid directly by the litigant seeking recovery; the economic realities of the contract between the intervenors and Goodrich Operating Company should be considered.
We recognize the peculiar facts presented herein raise a question never before *1034 addressed by the court. Accordingly, we must rely on analogous jurisprudence. In Rhodes v. Collier, 215 La. 754, 41 So.2d 669 (1949), the Supreme Court held:
[I]n cases where attorneys' fees are allowed, absence of proof that the fees have actually been paid, or an obligation incurred to pay, defeats recovery.
41 So.2d at 673. See also Melancon, supra.
The record reveals that Goodrich Operating Company paid $50,000 to the intervenors' attorney and was reimbursed by the Goodrich plaintiffs. The plaintiffs wanted the Cocke heirs to intervene in the suit; they agreed to do so if the plaintiffs would pay their legal fees. Although the fees were incurred, they were not incurred by the intervenors, and the evidence does not reveal any further obligation on the intervenors' part. Accordingly, they have no claim for reimbursement and the trial court's decision must be affirmed.

DECREE
For the above and foregoing reasons, the judgment of the trial court is amended, and as amended, affirmed in part, reversed in part, and remanded. That portion of the judgment which divides the remainder of the Goodrich lease into eight separate leases is hereby reversed. That portion of the judgment which excepts from lease cancellation certain acreage which has been unitized with off-tract wells is remanded for clarification of the particular depths to be included. The judgment is reversed insofar as it excludes the Shell Smith/Goodrich/Cocke No. 9 well from the list of wells to be retained by Exxon, and the case is remanded for a determination of the configuration of the 40 acre retention area surrounding the No. 9 well. In all other respects, the judgment is affirmed. Costs of this appeal are to be paid one-third by Exxon, and one-third by the plaintiffs, and one-third by the intervenors.
AMENDED, AND AS AMENDED, AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
NOTES
[*] Judge Joseph E. Coreil, Retired, and Judge John A. Patin, Retired, participated in this decision by appointment of the Louisiana Supreme Court as Judges Pro Tempore.
[1] "BF-4" refers to the Bigenerina floridana sand. Throughout the transcript, the CM series and the T, U, and V sands are referred to by initials rather than scientific designations.
[2] Our determination is strictly the result of a factual analysis. See Vetter, supra, for a case which analyzes these six factors and concludes that lease cancellation is warranted. For the opposite conclusion, see Frazier, supra.
[3] In Anslem v. Travelers Insurance Co., 192 So.2d 599 (La.App. 3d Cir.1966), this court held that, in the absence of prejudice, an appellate court will not disturb the trial court's discretion even when the rebuttal evidence should have been introduced in chief or is merely cumulative.
[4] For a complete discussion of the obligation of further exploration as compared to the obligation of reasonable development, see the Comment to La.R.S. 31:122 and cases cited therein.
[5] In oral reasons, the trial judge stated, "In addition, of course, the defendant has a right to retain all acreage being held by unitization whether the unit wells are on or off the lease."
[6] Counsel for Goodrich stated, "The point is, Your Honor, we are not asking to take that well away from Shell and Exxon. It is not within our area of relief." Further, he stated, "They ought to be happy we are not trying to take that well away from them."
[7] Exxon relies on Taussig, supra, as authority for the proposition that actions by some co-lessors under a mineral lease do not inure to the benefit of all remaining co-lessors. While it is true that some co-lessors were treated differently from other co-lessors in Taussig, that is strictly a result of the lessees' actions, not the ruling of the court. Pharis, Shultz, and the plaintiffs all made demands for cancellation; none demanded development. The lessees, for various reasons, granted the demands of Shultz and Pharis and agreed to cancel the lease as to their interests. The lessees were not legally bound to do so. Likewise, the lessees were not obligated to cancel this lease as to the plaintiffs and this court upheld that right.